[No. S113929. Aug. 2, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
CORNELL COOPER BROWN, Defendant and Appellant.

## COUNSEL

William D. Farber, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Margaret E. Maxwell, Donald E. De Nicola, Victoria B. Wilson and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

Emberly Cross for California Alliance Against Domestic Violence, California National Organization for Women, California Women's Law Center, Minnesota Program Development, Inc., NOW Legal Defense and Education Fund, Nancy K. D. Lemon, Erin C. Smith and Jim Fahey as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

KENNARD, J.—At defendant's trial on charges relating to domestic violence, the prosecution offered testimony from an expert witness to explain that domestic violence[1] victims often later deny or minimize the assailant's conduct. Defendant objected. He contended such testimony did not fall within the scope of Evidence Code section 1107,[2] which authorizes expert testimony on "battered women's syndrome." He argued the prosecution had failed to show that the victim here was a battered woman because it offered no proof that defendant had abused her on more than one occasion. The trial court overruled the objection and admitted the evidence. Defendant was convicted, and the Court of Appeal affirmed the judgment. We granted defendant's petition for review.

Two Court of Appeal decisions have addressed the issue whether expert testimony about the behavior of domestic violence victims is admissible when only one incident of abuse has occurred: *People v. Gomez* (1999) 72 Cal.App.4th 405 [85 Cal.Rptr.2d 101] (*Gomez*) held it inadmissible; *People v. Williams* (2000) 78 Cal.App.4th 1118 [93 Cal.Rptr.2d 356] (*Williams*) held it admissible. We conclude that in this case the evidence was admissible under Evidence Code section 801, because it would assist the trier of fact in evaluating the credibility of the victim's trial testimony and earlier statements

---

[1] We use the term "domestic violence" to refer to violence between persons who live together in an intimate relationship. Evidence Code section 1107 uses a broader definition of "domestic violence" that incorporates Family Code section 6211, which includes violence against children.

[2] Unless otherwise noted, statutory citations are to the Evidence Code.

to the police, by providing relevant information about the tendency of victims of domestic violence later to recant or minimize their description of that violence. (See *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 [283 Cal.Rptr. 382, 812 P.2d 563] (*McAlpin*).) We therefore do not reach the question whether the expert testimony here was also admissible under section 1107.

## I.  FACTS

Defendant and Kimberly Pipes, the victim, had been dating on and off for about 11 years. On April 17, 2001, they were living together in an apartment with Pipes's four children and Carrie Miller, a woman who took care of the children when Pipes worked.

Pipes rented the apartment from Leland Jordan, defendant's cousin. At 2:00 a.m. on April 17, Jordan came to the apartment to demand payment of back rent. When Pipes refused because Jordan had not fixed the water system, Jordan told Pipes to vacate the apartment. After Jordan left, Pipes and defendant began arguing. Pipes was upset because she thought defendant should have taken her side in the argument with Jordan.

Shortly thereafter, Deputy Sheriff James Wheeler responded to a telephone call from Pipes and found her with Carrie Miller in a parked car near the apartment. Pipes told Wheeler she had been assaulted. She said she tried to leave the apartment after an argument with defendant but he put his arm around her neck and dragged her to the bedroom. Defendant then went to the living room and returned to the bedroom with a steak knife and a barbeque fork, telling Pipes he would kill her if she left. She was afraid. When she said she wanted to leave, defendant replied, "I don't want you having my baby," and punched her in the stomach.[3] Miller told Deputy Wheeler that defendant had threatened to kill both her and Pipes if they left. He also threatened to have some women come over to beat up Miller and Pipes. Deputy Wheeler arrested defendant and found the steak knife where Pipes said it was.

Pipes's trial testimony differed from what she had told Deputy Wheeler earlier. At trial she said that when she started to leave the apartment, defendant took hold of her arm, not her neck, and pulled her back to the bedroom. She lay down for a while, then when she got up to leave again he slapped her in the stomach. Defendant had never struck her before. She lay down again for a few minutes, then she woke up Miller, went with Miller and the children to the car, drove a short distance, and called the police. Pipes said that defendant never threatened her.

---

[3] Pipes thought she was pregnant, and she told defendant so. It later turned out she was not.

Pipes testified that when she went into the apartment with the police, the officers said they did not have "enough to go on." Pipes then picked up the knife and fork and said defendant had "poked" them at her. Pipes said she did this so defendant would get arrested; in fact, he did not threaten her with the knife and fork. When asked whether defendant was doing anything against her will, Pipes replied, "not to the full extent, no."

Carrie Miller was not available to testify at the trial, so the prosecutor read to the jury Miller's testimony from the preliminary hearing. There Miller testified that she was asleep until Pipes woke her just before they left the apartment, so she did not know what happened between Pipes and defendant. She denied that defendant had ever threatened her.

Jeri Darr, Program Manager of the Antelope Valley Domestic Violence Council, testified as an expert witness for the prosecution. Before permitting the jury to consider Darr's testimony, the trial court instructed: "This evidence is not going to be received and must not be considered by you to prove the occurrence of the act or acts of abuse which form the basis of the crimes charged." Darr testified: Domestic violence victims, after describing the violence to the police, often later repudiate their description. There is typically "anywhere between 24 and 48 hours where victims will be truthful about what occurred because they're still angry, they're still scared." But "after they have had time to think about it . . . it is not uncommon for them to change their mind." About 80 to 85 percent of victims "actually recant at some point in the process." Some victims will say they lied to the police; almost all will attempt to minimize their experience.

Darr explained why victims of domestic violence may give conflicting statements: They may be financially dependent on the defendant. They may be pressured, or even threatened, by the defendant or other family members. They may still love the defendant and hope that things will get better. Darr stated: "[T]hey may tell us as advocates the truth but may recant once they realize that this is not going to be . . . 30 days in county jail or time served and go to counseling. They don't realize that oftentimes these types of cases add up and can compile and you could be looking at prison time." Darr testified that the tendency to recant or minimize accounts of violence applies to victims who have only one incident of abuse. According to Darr, a victim's attempt to leave "can often escalate a non-physically abusive relationship . . . into physical abuse."

Defendant objected to the admission of Darr's testimony. Citing *Gomez, supra,* 72 Cal.App.4th 405, he argued that the evidence lacked a foundation because the prosecution had failed to present proof of any earlier incident of abuse. The trial court overruled the objection, relying on *Williams, supra,* 78 Cal.App.4th 1118.

The jury convicted defendant on three counts: count II—threatening to commit a crime that would result in death or great bodily injury against Pipes (Pen. Code, § 422); count III—false imprisonment by violence against Pipes (*id.*, § 236); and count VI—misdemeanor battery against Pipes (*id.*, § 243, subd. (e)(1)).[4] The jury was unable to agree on the charge of assault with a deadly weapon on Pipes, and on the two charges relating to Miller; these charges were later dismissed at the prosecutor's request. The jury found that defendant had four prior convictions, and in each instance had not remained free from prison custody for more than five years. One of the prior convictions involved a serious or violent felony.

The trial court imposed a sentence of three years on count II (false imprisonment by violence), doubled as a second strike. With additional counts and enhancements, the sentence totaled 10 years eight months.

The Court of Appeal affirmed the judgment. Defendant's petition for review raised a single issue—whether the expert testimony here was admissible in the absence of evidence of more than one incident of abuse.

## II. Legal Analysis

### A. *The Nature of Domestic Violence*

Domestic violence is a serious social and legal problem in the United States, occurring in every economic, racial, and ethnic group. (*Developments in the Law—Domestic Violence* (1993) 106 Harv. L.Rev. 1499, 1501 (*Developments in the Law*); see Am. Psychological Assn., Violence and the Family (1997) p. 9 (APA).) It differs from other forms of criminal violence in several ways:

(1) As compared to other crimes, domestic violence is vastly underreported, and until the last 20 to 30 years was largely hidden from public examination. (See *State v. Kelly* (1984) 97 N.J. 178 [478 A.2d 364, 370]; APA, *supra*, p. 9; Waits, *The Criminal Justice System's Response to Battering: Understanding the Problem, Forging the Solutions* (1985) 60 Wash. L.Rev. 267, fn. 1 (Waits).)

---

[4] Counts III and VI are supported by both Pipes's statements to Deputy Wheeler and her trial testimony. Count II is the only conviction that rests entirely on Pipes's statement to Deputy Wheeler.

(2) In most cases, the batterers are male, the victims female.[5] (*Developments in the Law, supra,* 106 Harv. L.Rev. at p. 1501, fn. 1; see Okun, Woman Abuse: Facts Replacing Myths (1986) pp. 39–40.)

(3) "A fundamental difference between family violence and other forms of violence (such as street violence) is that family violence occurs within ongoing relationships that are expected to be protective, supportive, and nurturing. The ties between victim and victimizer often are the strongest emotional bonds, and victims frequently feel a sense of loyalty to their abusers. . . . [¶] Consequently, even a victim who reports an abusive family member to police may later protect the person by denying, minimizing, or recanting the report." (APA, *supra,* p. 5; see Waits, *supra* , 60 Wash. L.Rev. at pp. 306–307.) Thus, the prosecution of domestic violence cases presents particular difficulties. "Unlike conventional cases . . . where prosecutors rely on the cooperation and participation of complaining witnesses to obtain convictions, in domestic violence cases prosecutors are often faced with exceptional challenges. Such challenges include victims who refuse to testify, who recant previous statements, or whose credibility is attacked by defense questions on why they remained in a battering relationship." (Rogers, *Prosecutorial Use of Expert Testimony in Domestic Violence Cases: From Recantation to Refusal to Testify* (1998) 8 Colum. J. Gender & L. 67, 68 (Rogers); see Schroeder, *Using Battered Woman Syndrome Evidence in the Prosecution of a Batterer* (1991) 76 Iowa L.Rev. 553 (Schroeder).)

## B.   *The Battered Woman Syndrome Theory*

The theory of the "battered woman syndrome" originated in the works of psychologist Lenore Walker.[6] (Walker, The Battered Woman (1979); Walker, The Battered Woman Syndrome (1984); Walker, Terrifying Love: Why Battered Women Kill and How Society Responds (1989).) Dr. Walker relied on the psychological concept of "learned helplessness," under which an animal, or person, repeatedly unable to protect itself against injury, eventually learns that resistance is useless and becomes passive and despondent. (See *People v. Aris* (1989) 215 Cal.App.3d 1178, 1195 [264 Cal.Rptr. 167] (*Aris*); Faigman & Wright, *The Battered Woman Syndrome in the Age of Science* (1997) 39 Ariz. L.Rev. 67, 71–75 (Faigman); Griffith, *Battered Woman Syndrome: A Tool for Batterers?* (1995) 64 Fordham L.Rev. 141, 163–173.)

---

[5] The views expressed in this opinion, however, are equally applicable to cases in which the victim is male.

[6] Originally, Walker used the term "battered *woman* syndrome." Over time, the term has become plural and possessive, as reflected in section 1107, court decisions, and articles that refer to the "battered *women's* syndrome."

Thus, to fit under Dr. Walker's theory as a battered woman, the victim must go through the battering cycle at least twice, because under Walker's theory a woman who is beaten once and takes action against the batterer is not suffering from a pathological state of learned helplessness. (See Walker, The Battered Woman, *supra,* p. xv.)

Dr. Walker's "battered woman syndrome" theory has been criticized as lacking empirical support (Faigman, *supra,* 39 Ariz. L.Rev. at p. 68), and as demeaning to women (*id.* at p. 69). In particular, many critics assert that victims of domestic violence do not typically suffer from a pathological condition. (See *People v. Humphrey* (1996) 13 Cal.4th 1073, 1083–1084, fn. 3 [56 Cal.Rptr.2d 142, 921 P.2d 1] *(Humphrey)*; Bowman, *A Matter of Justice: Overcoming Juror Bias in Prosecutions of Batterers Through Expert Witness Testimony of the Common Experiences of Battered Women* (1992) 2 So.Cal. Rev.L. & Women's Stud. 219, 226, fn. 31, and articles there cited (Bowman); Dutton, *Understanding Women's Responses to Domestic Violence: A Redefinition of Battered Woman Syndrome* (1993) 21 Hofstra L.Rev. 1191, 1200–1201 (Dutton).) Thus, the critics maintain that the admissibility of expert evidence on the reactions of domestic violence victims should not depend on proof that the victim falls within Dr. Walker's description of a "battered woman." (See Bowman, *supra,* 2 So.Cal. Rev.L. & Women's Stud. at p. 236; Dutton, *supra,* 21 Hofstra L.Rev. at pp. 1200–1201.)

### C. *Evidence Code Sections 801 and 1107*

Section 801, subdivision (a), permits the introduction of testimony by a qualified expert when that testimony may "assist the trier of fact."

Section 1107, subdivision (a), provides: "In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding battered women's syndrome, including the nature and effect of physical, emotional, or mental abuse on beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge."

#### 1. *Applicability of sections 801 and 1107*

The Attorney General contends that the expert testimony of Jeri Darr was admissible under both sections 801 and 1107. Defendant, however, argues the Attorney General cannot now rely on section 801 because it was not raised either at trial or in the Court of Appeal.

■ If a judgment rests on admissible evidence it will not be reversed because the trial court admitted that evidence upon a different theory, a mistaken theory, or one not raised below. (See *People v. Mason* (1991) 52 Cal.3d 909, 944 [277 Cal.Rptr. 166, 802 P.2d 950]; see *People v. Smithey* (1999) 20 Cal.4th 936, 972 [86 Cal.Rptr.2d 243, 978 P.2d 1171].) As we said in *People v. Zapien* (1993) 4 Cal.4th 929 [17 Cal.Rptr.2d 122, 846 P.2d 704]: " 'No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for the wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion.' " (*Id.* at p. 976, quoting *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10].)

■ That principle does not apply, however, when the "new theory was not supported by the record made at the first hearing and would have necessitated the taking of considerably more evidence, [or when] the defendant had no notice of the new theory and thus no opportunity to present evidence in opposition." (*Green v. Superior Court* (1985) 40 Cal.3d 126, 137–138 [219 Cal.Rptr. 186, 707 P.2d 248] (lead opn. of Kaus, J.).)[7] That exception does not apply here because the evidence as to admissibility was fully developed in the trial court. (See *Green*, at p. 138.)

Defendant argues that the testimony of expert witness Jeri Darr, the prosecutor's closing argument to the jury, and the jury instructions were based on the premise that Darr's testimony was offered under section 1107; if the evidence had been offered under section 801, he says, he could have raised appropriate objections.

With respect to expert witness Jeri Darr, neither she nor the prosecutor mentioned the term "battered women's syndrome" during the prosecutor's direct examination of her; the term was mentioned only in questions to Darr by defense counsel on cross-examination and by the trial court, and a brief reference to it occurred on the prosecutor's redirect examination of Darr in response to defense counsel's questions.[8] As to the prosecutor's closing argument, it was based on Darr's testimony that when domestic violence

---

[7] Although Justice Kaus's opinion in *Green* was not a majority opinion, its position has been endorsed in later decisions of this court. (See, e.g., *People v. Robles* (2000) 23 Cal.4th 789, 801, fn. 7 [97 Cal.Rptr.2d 914, 3 P.3d 311]; *People v. Clark* (1993) 5 Cal.4th 950, 993, fn. 19 [22 Cal.Rptr.2d 689, 857 P.2d 1099]; *People v. Sims* (1993) 5 Cal.4th 405, 450, fn. 9 [20 Cal.Rptr.2d 537, 853 P.2d 992].)

[8] The record thus refutes the dissent's statement that expert witness Darr "testified at length as to the general causes and effects" of battered women's syndrome. (Dis. opn., *post*, at p. 910.)

victims testify they tend to retract or minimize the violence that occurred. The prosecutor did not claim that defendant had beaten the victim before or that defendant fit the profile of a batterer. Thus, neither Darr's testimony nor the prosecutor's argument was premised on the admissibility of her testimony under section 1107. Defendant, of course, was free to raise at trial the asserted lack of admissibility under section 801. Moreover, in this court, defendant has had a chance to present his arguments on the testimony's admissibility under that section. Therefore, defendant cannot complain that the prosecutor's failure to mention section 801 as a basis for admitting the expert evidence deprived him of the opportunity to object to its admissibility.

■ The instruction in question, CALJIC No. 9.35.1, advised the jury: "Battered women's syndrome research . . . begins with the assumption that physical abuse has occurred, and seeks to describe and explain common reactions of women to that experience. As distinguished from that research approach, you are to presume the defendant innocent. . . ." Defendant argues that by stating that research begins with the assumption that physical abuse has occurred, CALJIC No. 9.35.1 implicitly assumes the defendant is guilty. We disagree; the instruction expressly says that the jury is not to assume guilt, but "to presume the defendant innocent." (See CALJIC No. 10.69 [instructions on rape trauma syndrome and child abuse accommodation syndrome]; *People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1386–1387 [7 Cal.Rptr.2d 660].)

## 2. *California cases applying sections 801 and 1107*

The first California case to address the admissibility of expert evidence on domestic violence was *Aris, supra,* 215 Cal.App.3d 1178, which the Court of Appeal decided in 1989 before the Legislature enacted section 1107. In *Aris,* the trial court relied on section 801 to uphold the trial court's admission of Dr. Walker's testimony for the purpose of disabusing the jury of common misconceptions concerning the behavior of victims. (*Aris,* at pp. 1193–1194.) The Court of Appeal held that expert testimony was also admissible to explain how the victim's experiences as a battered woman affected her perceptions of danger and its imminence, and what actions were necessary to protect herself. (*Id.* at p. 1198.)

Notwithstanding *Aris,* trial courts often continued to exclude such expert evidence. (See Assem. Com. on Public Safety, Rep. on Assem. Bill No. 785 (1991–1992 Reg. Sess.) p. 2 (Assembly Committee).) Consequently, the Legislature in 1991 enacted section 1107 to ensure the admissibility of expert evidence on domestic violence for both the prosecution and the defense. (See Sen. Com. on Judiciary, Battered Woman Syndrome: Expert Testimony (1991) p. 3 (Senate Committee).)

After the Legislature's enactment of section 1107, the defendant in *People v. Romero* (1994) 8 Cal.4th 728 [35 Cal.Rptr.2d 270, 883 P.2d 388] contended that her trial attorney incompetently failed to investigate a defense based on the battered women's syndrome. In addressing that contention, we explained in a footnote: "[Battered women's syndrome] has been defined as 'a series of common characteristics that appear in women who are abused physically and psychologically over an extended period of time by the dominant male figure in their lives.' " (*Id.*, at p. 735, fn. 1, citing *State v. Kelly, supra*, 478 A.2d 364, 371.) *Romero* involved procedural requirements in habeas corpus proceedings, and thus did not discuss the admissibility of expert testimony on domestic violence. Two years later, that issue was presented in *Humphrey, supra,* 13 Cal.4th 1073.

*Humphrey* involved the admissibility of expert evidence on domestic violence under sections 1107 and 801. We began our discussion of that issue by quoting the description of battered women's syndrome in *People v. Romero, supra,* 8 Cal.4th at page 735, footnote 1. (*Humphrey, supra,* 13 Cal.4th at p. 1084.) *Humphrey* noted that according to amici curiae California Alliance Against Domestic Violence et al., "the preferred term among many experts today is 'expert testimony on battering and its effects' or 'expert testimony on battered women's experience,' " because, among other things, it avoids characterizing victims of domestic violence as mentally ill. (*Humphrey, supra,* 13 Cal.4th at pp. 1083–1084, fn. 3.)

After concluding that the expert testimony was relevant to whether the victim acted reasonably, *Humphrey* went on to hold that the expert evidence was also relevant to the victim's credibility, because it would assist the jury "by dispelling many of the commonly held misconceptions about battered women." (*Humphrey, supra*, 13 Cal.4th at p. 1087, quoting *People v. Day* (1992) 2 Cal.App.4th 405, 416 [2 Cal.Rptr.2d 916].) We noted that *McAlpin, supra,* 53 Cal.3d 1289, held that expert testimony regarding parental reluctance to report child molestation was admissible under section 801 to bolster a witness's credibility. Citing *McAlpin*, we concluded: "[T]he expert testimony in this case was 'needed to disabuse jurors of commonly held misconceptions.' . . . Thus, it was admissible under Evidence Code sections 801 and 1107." (*Humphrey, supra,* 13 Cal.4th at p. 1088.)

This court in *Humphrey, supra,* 13 Cal.4th 1073, did not decide the admissibility of expert testimony on domestic violence in a case involving only one incident of abuse. That issue first came before the Court of Appeal in 1999 in *Gomez, supra,* 72 Cal.App.4th 405. In that case, prosecution expert Gail Pincus testified at trial: "[A]bout 80 percent of the time a woman who has been 'initially assaulted' by a boyfriend, husband, or lover will recant, change, or minimize her story. This recanting does not happen only

after there has been a continuing pattern of abuse. In fact, depending on the severity of the incident, it is more likely to occur after a first incident." (*Id.* at p. 411.) The *Gomez* court, however, considered itself bound by this court's description of the battered women's syndrome as applicable only to women "who are abused physically and psychologically *over an extended period of time.*" (*People v. Romero, supra,* 8 Cal.4th 728, 735, fn. 1, italics added, quoted in *Humphrey, supra,* 13 Cal.4th at pp. 1083–1084.) *Gomez* therefore concluded that Pincus's testimony was inadmissible because a "single violent incident, without evidence of other physical or psychological abuse, is not sufficient to establish that a woman suffers from battered women's syndrome." (*Gomez, supra,* 72 Cal.App.4th at p. 417.)

The next year, the Court of Appeal in *Williams, supra,* 78 Cal.App.4th 1118, considered expert testimony from Jeri Darr, the same expert who testified here. In *Williams,* as in this case, Darr explained that after the initial incident of abuse there was a window of about 24 to 48 hours during which the domestic violence victim was likely to tell the truth, but that thereafter the victim was likely to deny or minimize the incident. Disagreeing with *Gomez, supra,* 72 Cal.App.4th 405, the *Williams* court held the expert testimony admissible even though the victim had described only one incident of abuse. *Williams* explained: "There is nothing in Evidence Code section 1107 to suggest that the Legislature intended that a batterer get one free episode of domestic violence before admission of evidence to explain why a victim of domestic violence may make inconsistent statements about what occurred and why such a victim may return to the perpetrator." (*Williams, supra,* at p. 1129.)[9]

### 3. *Admissibility of the expert evidence in this case*

In attempting to resolve the issue here by construing section 1107 we confront a conundrum. On the one hand, section 1107 speaks of expert testimony "regarding battered women's syndrome"; that syndrome, as set out by Dr. Lenore Walker and as described by the Court of Appeal in *Aris, supra,* 215 Cal.App.3d 1178, and by this court in *People v. Romero, supra,* 8 Cal.4th 728, and *Humphrey, supra,* 13 Cal.4th 1073, pertains to women who have been subjected to an extended period of abuse. On the other hand, section 1107 authorizes the expert to testify regarding "the nature and effect of

---

[9] The decisions of other states on the admissibility of expert testimony after a single incident of abuse are also in conflict. (Compare *State v. Niemeyer* (1999) 55 Conn.App. 447 [740 A.2d 416, 420] [admissible] with *State v. Stringer* (1995) 271 Mont. 367 [897 P.2d 1063, 1070] [inadmissible].)

physical, emotional, and mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence." Persons who have only been assaulted once are still "victims of domestic violence."[10]

Here, however, the admission of expert testimony does not depend on fitting it under section 1107. As we noted earlier, under subdivision (a) of section 801, expert testimony is admissible on any subject "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." Before the Legislature's enactment of section 1107, the Court of Appeal in *Aris, supra,* 215 Cal.App.3d 1178, upheld the admissibility of expert testimony on the behavior of victims of domestic violence. In *People v. Day, supra,* 2 Cal.App.4th 405, 415–417, the Court of Appeal held that in a trial before the enactment of section 1107 defense counsel was incompetent for not presenting expert testimony on the behavior of victims of domestic violence. *Day* relied on *McAlpin, supra,* 53 Cal.3d 1289, which this court decided under section 801. And in *Humphrey, supra,* 13 Cal.4th 1073, 1088, we upheld the admission of expert testimony under both sections 1107 and 801.

The Legislature, courts, and legal commentators have noted the close analogy between use of expert testimony to explain the behavior of domestic violence victims, and expert testimony concerning victims of rape or child abuse. (See Sen. Com., *supra,* p. 4; *Aris, supra,* 215 Cal.App.3d at p. 1193; *People v. Day, supra,* 2 Cal.App.4th at p. 415; Schroeder, *supra,* 76 Iowa L.Rev. at p. 570.) In *People v. Bledsoe* (1984) 36 Cal.3d 236 [203 Cal.Rptr. 450, 681 P.2d 291], we held expert testimony concerning rape victims—the rape trauma syndrome—to be admissible under section 801 to dispel common misconceptions about how such victims behave (*Bledsoe,* at pp. 242–243), but not to prove that the victim had actually been raped (*id.* at p. 251). And in *People v. Bowker* (1988) 203 Cal.App.3d 385 [249 Cal.Rptr. 886], the Court of Appeal said that when an allegedly abused child "recants his story in whole or in part, a psychologist could testify on the basis of past research that such behavior is not an uncommon response for an abused child. . . ." (*Id.* at p. 394.) Although the expert in *Bowker* had referred to the "child abuse accommodation syndrome," the Court of Appeal observed: "[A]n expert has little need to refer to the syndrome in order to testify that a particular type of behavior is not inconsistent with a child having been abused." (*Id.* at p. 392.)

---

[10] One commentator asserts: "In an effort to increase the knowledge available to the jury, the section [§ 1107] does not limit the evidence to . . . the effects of repeated (at least two incidents) and severe violence over a substantial period of time . . . . Instead, the statute is intended to permit all relevant evidence of the effects of abuse, including a single incident of violence in a relationship . . . ." (Bowman, *supra,* 2 So.Cal. Rev.L. & Women's Stud., at p. 237.)

Thereafter, in *McAlpin, supra,* 53 Cal.3d 1289, we made it clear that admissibility of expert testimony does not depend on a showing based on a recognized "syndrome." That case concerned expert testimony about the behavior of parents of abused children. We first explained the admissibility of evidence about the behavior of the children themselves: "[E]xpert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations.] 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*Id.* at pp. 1300–1301.)

We then addressed the admissibility of evidence relating to the credibility of the mother of an abused child. Notwithstanding the absence of a "parents of abused children syndrome" encompassing such evidence, *McAlpin* held it admissible, explaining: "It is reasonable to conclude that on the basis of their intuition alone many jurors would tend to believe that a parent of a molested child . . . would promptly report the crime to the authorities. . . . Yet here the prosecution had evidence to the contrary—the expert opinion of Officer Miller that in fact it is not at all unusual for a parent to refrain from reporting a known child molestation, for a number of reasons. Such evidence would therefore 'assist the trier of fact' (Evid. Code, § 801, subd. (a)) by giving the jurors information they needed to objectively evaluate [the mother's] credibility." (*McAlpin, supra,* 53 Cal.3d at p. 1302; see also *People v. Housley* (1992) 6 Cal.App.4th 947, 955–956 [8 Cal.Rptr.2d 431] [expert testimony admissible to explain why child recanted her claim that the defendant molested her].)

Similar reasoning supports admissibility of the expert testimony here. When the trial testimony of an alleged victim of domestic violence is inconsistent with what the victim had earlier told the police, the jurors may well assume that the victim is an untruthful or unreliable witness. (See *Arcoren v. United States* (8th Cir. 1991) 929 F.2d 1235, 1239; *State v. Stringer, supra,* 897 P.2d at pp. 1068–1069; Schroeder, *supra,* 76 Iowa L.Rev. at p. 573.) And when the victim's trial testimony supports the defendant or minimizes the violence of his actions, the jurors may assume that if there really had been abusive behavior, the victim would not be testifying in the defendant's favor. (See *Humphrey, supra,* 13 Cal.4th at p. 1087; *People v. Day, supra,* 2 Cal.App.4th at p. 415; *Commonwealth v. Goetzendanner* (1997) 42 Mass.App.Ct. 637 [679 N.E.2d 240, 243–245]; *State v. Ciskie* (1988) 110 Wn.2d 263 [751 P.2d 1165, 1169–1170]; Rogers, *supra,* 8 Colum. J. Gender & L. at p. 78.) These are common notions about domestic violence victims akin to those notions about rape and child abuse victims that this court

discussed in *People v. Bledsoe, supra,* 36 Cal.3d 236, and *McAlpin, supra,* 53 Cal.3d 1289, and that the Court of Appeal discussed in *People v. Housley, supra,* 6 Cal.App.4th at pages 955–956.

At trial, expert witness Jeri Darr described the tendency of domestic violence victims to recant previous allegations of abuse as part of the particular behavior patterns commonly observed in abusive relationships. The "cycle of violence" in an abusive domestic relationship, she explained, does not necessarily begin with physical abuse. Most abusive relationships begin with a struggle for power and control between the abuser and the victim that later escalates to physical abuse. The initial "tension building stage" of the cycle can appear in deceptively mundane ways, such as complaints about the cleanliness of the house. Often the abuser uses psychological, emotional, or verbal abuse to control the victim. When the victim tries to leave or to assert control over the situation, the abuser may turn to violence as an attempt to maintain control. Later, even if there has been no other episode of violence, the victim may change her mind about prosecuting the abuser and may recant her previous statements.

Here, there was an adequate foundation for that expert testimony, because evidence presented at trial suggested the possibility that defendant and Kimberly Pipes were in a "cycle of violence" of the type described by expert Jeri Darr. Pipes told Deputy Wheeler that defendant had complained about the cleanliness of the apartment on the evening of the assault. There was also evidence that Pipes and defendant also argued that evening about defendant's failure to take her side in an argument with his cousin (their landlord) regarding the rent, that defendant told Pipes that if she did not pay the rent she would have to move out, and that he later threatened to kill her if she did leave. Finally, there was evidence that when Pipes actually tried to leave the apartment, defendant assaulted her. To assist the jury in evaluating this evidence, the trial court properly admitted the expert testimony by Darr.

■ Defendant argues that a trial court should not admit evidence on domestic violence under section 801 unless it first determines that the evidence is admissible under section 1107. He maintains that section 1107 is a special statute that takes precedence over the more general terms of section 801. (See Code Civ. Proc., § 1859.) The Legislature, however, was aware that evidence on domestic violence had been held admissible under section 801 (See Assem. Com., *supra,* p. 1; Sen. Com., *supra,* p. 3), and in enacting section 1107, it stated expressly: "The Legislature does not intend Section 1107 of the Evidence Code to preclude the admissibility of evidence of battered women's syndrome under other statutory or case law." (Stats. 1991, ch. 812, § 2, p. 3613.)

■ Finally, defendant contends that the argument for admitting expert testimony after a single incident of violence is circular, because the jury must first find the preliminary fact of abuse to be true before it may consider the expert evidence. We do not share that view. The argument that evidence relating to credibility cannot be admitted until the underlying charge has been found true was rejected by the Court of Appeal in *People v. Morgan* (1998) 58 Cal.App.4th 1210, 1215–1216, [68 Cal.Rptr.2d 772], a domestic violence case, and in *People v. Housley, supra,* 6 Cal.App.4th 947, a child molestation case. To be sure, this kind of evidence cannot be admitted to prove the occurrence of the charged crimes. (See § 1107; *People v. Bledsoe, supra,* 36 Cal.3d at p. 251; *People v. Bowker, supra,* 203 Cal.App.3d at p. 394; *Humphrey, supra,* 13 Cal.4th at p. 1088, fn. 5.) There must be independent evidence of domestic violence—otherwise the expert testimony about how victims of domestic violence behave would lack foundation. Here such evidence was supplied by both Pipes's trial testimony in court and by her earlier statement to Deputy Wheeler.

Once there is evidence from which the trier of fact could find the charges true, evidence relating to the credibility of the witnesses becomes relevant and admissible. There is no rule requiring a preliminary *finding* that the charged act of abuse occurred before the jury can consider the evidence relating to credibility. In rape and child abuse cases, we do not require either the trial judge or the jury to determine that the victim was raped or abused before the trial court admits expert testimony on credibility. The same principle applies to admission of expert testimony on domestic violence.

■ We therefore conclude that the Court of Appeal did not err in upholding the trial court's admission of expert testimony concerning the behavior of victims of domestic violence even though the evidence showed only one violent incident. Any language in *People v. Gomez, supra,* 72 Cal.App.4th 405, contrary to this conclusion, is disapproved.

DISPOSITION

The judgment of the Court of Appeal is affirmed.

George, C. J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

**BROWN, J.,** Dissenting.—We granted review in this case to resolve a conflict in the Courts of Appeal concerning the admissibility of battered women's syndrome (BWS) testimony pursuant to Evidence Code section 1107[1] in the absence of evidence of a prior incident of domestic violence.

---

[1] All undesignated statutory references are to the Evidence Code.

(Compare *People v. Williams* (2000) 78 Cal.App.4th 1118 [93 Cal.Rptr.2d 356], with *People v. Gomez* (1999) 72 Cal.App.4th 405 [85 Cal.Rptr.2d 101].) Rather than confront this question directly, the majority holds that the testimony in this case was, in any event, admissible under the more general provisions of section 801 concerning expert witnesses. In reaching this conclusion, the majority not only evades determining the proper application of section 1107 and our responsibility to "secure uniformity of decision" (Cal. Rules of Court, rule 28(b)(1)), but disregards settled principles governing expert testimony. Because I find the evidence regarding BWS was not relevant to any disputed fact—and its admission prejudiced defendant—I dissent.

## I

In determining the admissibility of any expert witness testimony, the threshold question is not simply whether the subject "is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . ." (§ 801, subd. (a).) Rather, as with all evidence, the first inquiry is whether the testimony is relevant, i.e., whether it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action," including the credibility of a witness. (§ 210.) Unless and until the proponent demonstrates that an expert's testimony has the requisite relationship to a disputed fact, it is irrelevant and cannot assist the trier of fact.

"Battered women's syndrome 'has been defined as "a series of common characteristics that appear in women who are abused physically and psychologically over an extended period of time by the dominant male figure in their lives." [Citations.]' [Citation.]" (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1083–1084 [56 Cal.Rptr.2d 142, 921 P.2d 1] (*Humphrey*); *People v. Erickson* (1997) 57 Cal.App.4th 1391, 1399 [67 Cal.Rptr.2d 740].) Accordingly, the overwhelming majority of courts considering the question have concluded that the relevance of expert testimony regarding BWS depends upon its proponent establishing "some evidentiary foundation that a party or witness to the case is a battered woman, and that party or witness has behaved in such a manner that the jury would be aided by expert testimony providing an explanation for the behavior. [Citation.]" (*State v. Borrelli* (1993) 227 Conn. 153, 172, fn. 15 [629 A.2d 1105, 1115]; see *Fennell v. Goolsby* (E.D.Pa. 1985) 630 F.Supp. 451, 459; *State v. Niemeyer* (1999) 55 Conn.App. 447, 452 [740 A.2d 416, 419–420]; *State v. Stringer* (1995) 271 Mont. 367, 378 [897 P.2d 1063, 1070]; *State v. Koss* (1990) 49 Ohio St.3d 213, 218 [551 N.E.2d 970, 974–975]; *Bechtel v. State* (Okla.Crim.Ct.App. 1992) 1992 OKCR 55 [840 P.2d 1, 9]; *State v. Ogden* (2000) 168 Or.App. 249, 257 [6 P.3d 1110, 1114]; see also *State v. Kelly* (1984) 97 N.J. 178, 200–201 [478 A.2d 364, 375].)

Here, the record contained no evidence Kimberly Pipes suffered from BWS. Not only had there been no pattern of physical or psychological abuse in her relationship with defendant, she flatly denied he had ever hit her in the past. Nor were there any of the substantive characteristics—dependency, control, isolation—that mark BWS. Nevertheless, and contrary to the majority's reading of the record (see maj. opn., *ante*, at p. 901), expert witness Jeri Darr testified at length as to general causes and effects of BWS as well as anecdotal BWS experiences she had observed in the course of her work with domestic violence victims.[2] She described in considerable detail the cycle of tension-building, explosion of violence, and contrition that typifies the battering relationship, and the factors that contribute to its perpetuation, such as the victim's dependence on the abuser; the abuser's desire for power and control, his isolation of the victim, and his threats of harm to the victim and/or other family members; and the victim's passivity, fear, and lack of self-esteem. Darr also explained the common reactions of women in these abusive relationships: denial or minimizing of physical injury, self-blame, reconciliation and reunion with the abuser, learned helplessness, and recantation.

As the majority acknowledges, "[t]he prosecutor did not claim that defendant had beaten the victim before or that defendant fit the profile of a batterer" (maj. opn., *ante*, at p. 902), or that Pipes suffered BWS. Thus, general BWS evidence was plainly irrelevant to any disputed issues. (See, e.g., *State v. Ogden, supra*, 168 Or.App. at p. 257 [6 P.3d at p. 1114].) To paraphrase the court in *Ogden*, "at trial, the state failed to establish a critical link between the expert's testimony about why a battered woman might [recant her earlier claim of abuse] and why this complainant did so. Specifically, the state did not establish that complainant suffers from BWS. If complainant does not suffer from BWS, then testimony about that subject seemingly has no bearing

---

[2] Contrary to the majority's statement that "neither Darr's testimony nor the prosecutor's argument [to the jury] was premised on the admissibility of her testimony under section 1107" (maj. opn., *ante*, at p. 902), the record is replete with references to "battered women's syndrome" and by implication section 1107. At the hearing on the motion in limine to exclude Darr's evidence, the court referred to "testimony about battered women's syndrome"; and the prosecutor and defense counsel argued its admissibility or inadmissibility, respectively, under *People v. Williams, supra*, 78 Cal.App.4th 1118 and *People v. Gomez, supra*, 72 Cal.App.4th 405, both premised on section 1107. At the close of the hearing, the prosecutor specifically stated, "As *Williams* indicates, there's no limitation in . . . Evidence Code [section] 1107, that there be prior incidents, and that's why the *Williams* case allowed it in." In discussing the evidence during closing argument, the prosecutor asked the jury, "How did we know it [the incident] happened? . . . [¶] First of all, the victim made the statement to the deputy shortly after the incident. . . . And we also heard from Jeri Darr, domestic violence expert who spoke about the battered women's syndrome." The trial court twice instructed the jury on the matter: immediately prior to Darr's testimony—"Evidence may be presented to you concerning battered women's syndrome"—and at the conclusion of the evidence—"Evidence has been presented to you concerning battered women's syndrome." Finally, defendant appealed his conviction on the ground the evidence had been improperly admitted under section 1107, and the Court of Appeal ruled on that basis, adopting the reasoning of *People v. Williams*.

on the complainant's behavior." (*Id.* at p. 256 [6 P.3d at p. 1114].) Thus, in the absence of evidence Pipes exhibited BWS, a substantial portion of Darr's testimony was irrelevant and should not have been admitted whether the evidentiary basis was section 1107 or section 801.

## II

The majority concludes expert evidence was nevertheless relevant to counter certain misconceptions lay jurors may have about the behavior of victims of generic domestic violence. At the hearing on defendant's motion in limine, the prosecutor indicated she intended to introduce Darr's testimony "to explain why [Pipes] recanted at the preliminary hearing, and I anticipate that she will recant at the trial and why she gave the inconsistent statements and why, frankly, she went back to him." Even if the testimony had been restricted to the recantation and reconciliation aspects of violent domestic situations,[3] I would still take issue with its relevance. The majority's analysis is equally untenable even on this more limited question.

According to some experts, including Darr, even first-time victims of domestic violence are likely in certain circumstances to recant their initial claims of abuse or threats of harm. From this premise, the argument goes that since Pipes recanted some of her original statements to the police and since she was a victim of domestic violence, her recantation was likely false. The syllogism is faulty in several respects. It assumes that generic "domestic violence"—like BWS—describes a pattern of behavior that includes certain reactions to incidents of abuse. In reality, "domestic violence" is neither cause nor effect; it is simply a label, now codified (see Fam. Code, § 6211),[4] for abuse occurring in statutorily specified relationships. Moreover, the argument

---

[3] In the course of 21 pages of reporter's transcript, the prosecutor asked only three or four questions concerning recantation and reconciliation.

[4] Family Code section 6211 provides in part:

" 'Domestic violence' is abuse perpetrated against any of the following persons:

"(a) A spouse or former spouse.

"(b) A cohabitant or former cohabitant, as defined in Section 6209.

"(c) A person with whom the respondent is having or has had a dating or engagement relationship.

"(d) A person with whom the respondent has had a child . . . .

"(e) Child of a party or a child who is the subject of an action under the Uniform Parentage Act . . . .

"(f) Any other person related by consanguinity or affinity within the second degree."

For purposes of section 6211, "abuse" is defined as "intentionally or recklessly to cause or attempt to cause bodily injury, or sexual assault, or to place a person in reasonable apprehension of imminent serious bodily injury to that person or to another." (Fam. Code, § 6203.)

" 'Cohabitant' means a person who regularly resides in the household. 'Former cohabitant' means a person who formerly regularly resided in the household." (Fam. Code, § 6209.)

essentially works backward from effect to posit cause: That is, even in the absence of any history of abuse between defendant and Pipes, the fact of their domestic relationship coupled with her denial at trial of any assault or threat of harm made the substance of her recantation more likely false. Without, however, some evidence Pipes came within Darr's "domestic violence victim" construct, testimony as to the significance of Pipes's recantation had no evidentiary foundation. (See *State v. Ogden, supra,* 168 Or.App. at p. 256 [6 P.3d at p. 1114].) It does not, as the prosecutor asserted it would, explain "why." Recantation is not a predicate of abuse but the other way around. Only when a woman is in a relationship exhibiting characteristics of domestic violence can expert evidence elucidate its effects on her behavior and the reasons she may be more likely to recant an initial claim of assault.

In sum, as defense counsel explained at oral argument, the problem with the majority's reasoning is that under section 801, admissibility depends upon having some evidence in the record consistent with the subject matter of the expert's testimony other than the underlying incident. (Cf. *Humphrey, supra,* 13 Cal.4th at pp. 1096, 1098–1100 (conc. opn. of Brown, J.).) In this context, the foundational facts must consist of the substance, not the manifestation, of an abusive domestic relationship as described by the expert, and not simply as a matter of statutory definition. No such evidence appears here.[5] Although defendant and Pipes had known each other and dated off and on for 11 years and had been living together intermittently at the time of the incident, defendant had never abused or threatened Pipes or her children. Nor does the record establish that Pipes was in any respect dependent on defendant emotionally or financially, that he exerted control over her, or that he kept her isolated from family and friends. Pipes does not appear to be a passive personality and was unequivocal at trial that she reacted out of anger, and not fear, when she initially accused defendant.

---

[5] The majority implies the evidence conforms to Darr's domestic violence paradigm because "Pipes told Deputy Wheeler that defendant had complained about the cleanliness of the apartment on the evening of the assault." (Maj. opn., *ante,* at p. 907.) Even assuming this scant evidence, in the abstract, would suffice as tension-building, the majority's reliance is completely out of context. Pipes testified—and was not contradicted on this record—that she and defendant argued principally over her refusal to pay full rent due to the "unlivable" condition of the house and defendant's cousin's failure to make repairs. When, earlier on the night of the incident, the cousin had come to demand payment, Pipes became angry when defendant did not take her side in the dispute. The reference to cleanliness arose in the context of this disagreement. Apparently, defendant had agreed to make some repairs, but complained that he was unable to because the house was too much of a mess. On cross-examination, Pipes agreed with defense counsel that the situation "wasn't much of an argument, a couple of minutes of getting it off his chest, you getting your complaints off your chest." Nothing in Pipes's initial statements to the deputy substantiates a different characterization or reasonably foreshadows an impending cycle of violence.

On these facts, nothing in the majority's analysis distinguishes a first-time or single-incident assault committed in a domestic relationship from one committed in a nondomestic relationship. Recantation is hardly unique to domestic situations (see, e.g., *People v. Sam* (1969) 71 Cal.2d 194 [77 Cal.Rptr. 804, 454 P.2d 700]; *People v. Anthony O.* (1992) 5 Cal.App.4th 428 [6 Cal.Rptr.2d 794]; *People v. Plasencia* (1985) 168 Cal.App.3d 546 [223 Cal.Rptr. 786]; see also *People v. Odom* (1969) 71 Cal.2d 709 [78 Cal.Rptr. 873, 456 P.2d 145]; *People v. Loyd* (1977) 71 Cal.App.3d Supp. 1 [139 Cal.Rptr. 693]); and the majority fails to identify what misconceptions lay jurors may harbor in these circumstances that require expert testimony to correct. (Cf. *People v. Bothuel* (1988) 205 Cal.App.3d 581, 587 [252 Cal.Rptr. 596], disapproved on other grounds in *People v. Scott* (1994) 9 Cal.4th 331, 348 [36 Cal.Rptr.2d 627, 885 P.2d 1040].)

The attempt to analogize to expert testimony concerning rape trauma syndrome (RTS) or child sexual abuse accommodation syndrome (CSAAS) is unpersuasive. (See *People v. Bledsoe* (1984) 36 Cal.3d 236, 247–248 [203 Cal.Rptr. 450, 681 P.2d 291]; *People v. Sanchez* (1989) 208 Cal.App.3d 721, 735 [256 Cal.Rptr. 446]; cf. *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1302 [283 Cal.Rptr. 382, 812 P.2d 563].) The principal distinction is that misconceptions about the reactions of rape or child molestation victims are much more likely to arise from an initial or single incident; and neither rape nor molestation depends upon the nature of the relationship between the defendant and the victim or particular characteristics of that relationship. The same cannot be said regarding an initial incident of generic domestic violence. "Any woman may find herself in an abusive relationship with a man once." (Walker, The Battered Woman Syndrome (1979) p. XV; cf. *People v. Gomez, supra,* 72 Cal.App.4th at pp. 416–417.) Misconceptions arise when the woman seemingly allows the relationship to continue despite repeated abuse, since uninformed jurors may assume she would leave when the opportunity presented itself. (See, e.g., *Humphrey, supra,* 13 Cal.4th at p. 1087; *State v. Kelly, supra,* 478 A.2d at p. 370.) In other words, in situations of domestic violence, it is the repetitive aspect of the abusive behavior that becomes relevant in terms of the victim's counterintuitive state of mind and reactions. With RTS and CSAAS, the initial sexual assault or molestation is sufficient to trigger the reactions—such as delayed reporting—about which the expert enlightens the jury.

Moreover, in *McAlpin, Bledsoe,* and other cases involving rape and child molestation, the expert testimony was in virtually all cases admitted to explain counterintuitive out-of-court conduct, not to attack the credibility of a victim's sworn trial testimony. (Cf. *People v. Morgan* (1997) 58 Cal.App.4th 1210, 1216 [68 Cal.Rptr.2d 772]; but see *People v. Housley* (1992)

6 Cal.App.4th 947, 955–956 [8 Cal.Rptr.2d 431].) In the former situation, no rules of evidence are available to rebut misconceptions without expert testimony. In the latter, section 780 and, in particular, section 1235 provide evidentiary bases both to challenge the victim's credibility and to proffer her out-of-court statements as substantive evidence.

## III

Contrary to the majority's implication, excluding expert testimony on these facts does not somehow allow a batterer to act with impunity. (Maj. opn., *ante*, at p. 904, quoting *People v. Williams, supra*, 78 Cal.App.4th at p. 1129.) It simply means the prosecutor may not use expert testimony to attack the credibility of the victim's sworn testimony or to bolster the credibility of her hearsay reports to law enforcement or others. Nonetheless, her prior inconsistent statements are admissible as substantive evidence (see § 1235; *People v. Chavez* (1980) 26 Cal.3d 334, 354–361 [161 Cal.Rptr. 762, 605 P.2d 401]); and she may be impeached on a wide variety of bases, including her demeanor; bias, interest, or other motive; prior inconsistent statements; and attitude toward the proceedings (see generally § 780, subds. (a), (f), (h), (j)). The majority offers no rationale for concluding the prosecutor should not be restricted to these standard rules of evidence in single-incident domestic assault cases just the same as in nondomestic assault cases. Clearly, in the latter circumstance, the prosecution would not be entitled to invoke expert testimony to "explain" why the victim's testimony under oath should be discounted in favor of her statement to the police at the time of the alleged act. Furthermore, at least with respect to an initial or single assault, nothing in this record establishes that lay jurors are any less able in the absence of expert testimony to understand why a victim might falsely recant in the former as in the latter. That being the case, admission of expert testimony runs a substantial risk of invading the exclusive factfinding province of the jury (cf. *Humphrey, supra*, 13 Cal.4th at pp. 1099–1100 (conc. opn. of Brown, J.)) and undermining the trial court's gatekeeper function in exercising discretion to exclude such evidence for that reason. (§ 352; see, e.g., *People v. Roscoe* (1985) 168 Cal.App.3d 1093, 1100 [215 Cal.Rptr. 45].)

The majority's holding creates a special rule for the admission of expert testimony when the defendant and alleged victim of an assault have or have had a personal relationship that comes within the definition of "domestic violence" set forth in Family Code section 6211—a "domestic situation" exception to the usual relevancy requirement.

Among the problems with such an exception, it effectively evades application of section 1107 and, in particular, the express limitation on the use of BWS evidence "against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge." (§ 1107, subd. (a); cf. *People v. Bledsoe, supra*, 36 Cal.3d at p. 251 [RTS evidence not admissible to prove victim was raped].) As defense counsel explained at oral argument, the expert's testimony on the question of recantation is relevant only if Pipes were a victim of domestic violence so that her experience was consistent with Darr's expertise regarding such circumstances. But the only incident of domestic violence was the underlying charge. Therefore, the jury must assume the truth of the criminal allegation to accept Darr's testimony as to the significance of Pipes's recantation. Absent enforcement of the statutory restriction, section 1107 is rendered nugatory.

The majority's holding may also become an unwieldy double-edged sword that invites a host of unintended consequences. Section 1107 permits introduction of expert testimony regarding BWS for both the prosecution and defense. Nothing in the majority's reasoning suggests any basis for a different standard of admissibility for defense expert testimony under section 801 or limits the defense from similarly introducing non-BWS domestic violence evidence based on only a single battering incident. Nor would such evidence be restricted to testimony about recantation or reconciliation as in this case. Moreover, Family Code section 6211 broadly defines " '[d]omestic violence' " to include a wide range of individuals and relationships. The majority's same reasoning may well be asserted in seeking to introduce new strains of expert evidence with respect to these as well as the more common situation at issue here. Such a result would bring expert testimony far afield from the BWS evidence admissible under section 1107, particularly given the consensus that the counterintuitive behavior of battered victims follows from the repeated cycle of violence they learn to accommodate. (See *Humphrey, supra*, 13 Cal.4th 1073, 1096 (conc. opn. of Brown, J.); *People v. Gomez, supra*, 72 Cal.App.4th at pp. 416–417; *State v. Ogden, supra*, 168 Or.App. at p. 257 [6 P.3d at p. 1114]; *Ibn-Tamas v. United States* (D.C.Ct.App. 1979) 407 A.2d 626, 634.)

## IV

Since I conclude the trial court should have excluded Darr's testimony in its entirety, the question remains whether its admission resulted in a miscarriage of justice. (*People v. Watson* (1956) 46 Cal.2d. 818, 835 [299 P.2d 243].)

Although this is a close case, I would find prejudice for the following combination of reasons: The charge of making terrorist threats against Pipes (Pen. Code, § 422)—and arguably the false imprisonment charge involving her (*id.*, § 236)—rested solely on Pipes's statements to law enforcement. Darr testified extensively regarding BWS, well beyond the limited purpose of explaining recantation or reconciliation. In her closing argument, the prosecutor similarly did not restrict herself to the proffered justification, but heavily adverted to the whole of Darr's testimony. The trial court likewise did not admonish the jury to confine its consideration of the evidence to these factors. The jury failed to return verdicts on similar charges involving Carrie Miller, who also recanted, but whose out-of-court statements did not have the benefit of any BWS or domestic violence credibility enhancement. Finally, courts have long recognized the powerful impact of expert testimony in jury deliberations, for the very reason that such evidence relates to matters outside the layperson's ken. (See, e.g., *People v. Gomez, supra,* 72 Cal.App.4th at p. 418; see also *People v. Axell* (1991) 235 Cal.App.3d 836, 862 [1 Cal.Rptr.2d 411].)

In light of the foregoing, I would reverse the judgment at least as to the violation of Penal Code section 422.