Filed 9/25/20  P. v. Rosacia CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B298530 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA086711) |
| v. | |
| JAYSON GAELA ROSACIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gregory A. Dohi, Judge.  Affirmed.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, David E. Madeo and Heidi Salerno, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

Defendant Jayson Gaela Rosacia, who was convicted of multiple counts of sexual assault against his minor daughter, appeals from a judgment of conviction following a jury trial. Defendant contends that the trial court erred in admitting evidence of his possession of child pornography and his search of internet sites involving child pornography and incest. We affirm.

# II. BACKGROUND

A. *Procedural History*

On February 15, 2019, the Los Angeles County District Attorney charged defendant by amended information with 11 counts of aggravated sexual assault upon a child under the age of 14. Specifically, the information charged defendant with rape (Pen, Code,[1] § 269, subd. (a)(1); counts 1 through 3, 11 through 14); oral copulation (§ 269, subd. (a)(4); counts 4 and 10); and sexual penetration (§ 269, subd. (a)(5); counts 5 and 9). The information also alleged one count of oral copulation or sexual penetration with a child 10 years old or younger. (§ 288.7, subd. (b); count 8.)

On May 8, 2019, a jury returned a verdict finding defendant guilty of all 12 counts. At the May 30, 2019, sentencing hearing, the trial court sentenced defendant to an aggregate term of 180 years to life in prison.

---

[1] Further statutory references are to the Penal Code unless otherwise stated.

2

B.    *Prosecution Evidence*

1.    <u>August 29, 2017, Interviews of J.R.</u>

On August 29, 2017, officers with the Los Angeles Police Department and a nurse interviewed J.R., who was then 13 years old.  J.R. stated that she lived with defendant, her mother, and two younger siblings.

J.R. reported that defendant had "tricked [her] to have sex with him."  When asked if she knew what sex was, J.R. stated it was defendant putting "his private thing inside [her]."  J.R. further explained that defendant did not use condoms when he had intercourse with her, but on two occasions, he gave her birth control pills.

When J.R. was about seven years old, defendant began touching her vagina and forcing her to orally copulate him.  J.R. recalled one instance when defendant forced her to orally copulate him in his car.  On another occasion, defendant, who was a videographer for pornographic movies, recorded himself while he attempted to penetrate J.R.'s vagina with his penis.

Sometime in August or September 2015, when she was in the sixth grade, J.R. told defendant that she had arm wrestled a boy at school.  Defendant told J.R. that she could become pregnant from the arm wrestling unless she had sex with defendant.  J.R. initially refused to comply, but defendant responded that he would kill himself if she did not do as he asked.  J.R. believed him.  Therefore, while J.R.'s mother was away, J.R. had intercourse with defendant.  Afterwards, defendant told J.R. that if her mother learned about what had happened, she would kill them both.  Defendant also told J.R.

that a guard would be watching her to make sure that she did not tell anyone what he had done.

A few days later, defendant told J.R. that she had to have sex with defendant at least four times if she wanted to prevent becoming pregnant. He then raped her in the bathroom and again in his bedroom. J.R. would wake up to defendant touching her or taking off her underwear. Defendant would then leave or tell her that she was dreaming.

When J.R. was 12 years old, defendant put his weight on her, covered her mouth, and raped her. In August 2017, defendant raped her again.

On August 28, 2017, the day before her interview with the police, defendant, after learning that J.R. had a boyfriend, told J.R. to get into the car so that they could talk. Defendant then forced J.R. to orally copulate him as punishment for having a boyfriend. Defendant also touched J.R.'s genitals and digitally penetrated her vagina.

Later that day, J.R. went to bed at 9 p.m., and awoke as defendant entered her bedroom. Defendant forced J.R. to touch his penis while he fondled her genitals. At 1 a.m., defendant again forced J.R. to touch his penis while he touched her vagina. Defendant then raped her and told her to moan like she enjoyed it. Defendant ordered her not to cry and threatened that the more she cried, the more he would "do it to [her]." In the morning, J.R. woke up in pain.

The following day at school, J.R. told her friends, H.S. and S.A., and her cousin about what defendant had done the prior day. All four girls walked to the counselor's office, where J.R. reported defendant's abuse. The counselor called the Department of Children and Family Services and the police.

4

## 2. Physical Examination and DNA Evidence

On August 29, 2017, a nurse examined J.R. and observed four injuries that were consistent with recent sexual penetration. The nurse also administered a rape kit to J.R. and swabbed her mouth, face, breasts, genitalia, left inner thigh, right leg, right hip area, lower back, lower abdomen, and buttocks.

The nurse also examined defendant, swabbing his fingers, fingernails, genitals, face, cheeks, and neck. The swab of defendant's penis yielded a major profile and a minor profile, which meant that one DNA profile contributed more to a sample than another. The major profile belonged to J.R.[2] The minor profile belonged to defendant.

DNA from J.R.'s vaginal swab matched defendant's DNA. Swabs of J.R.'s left breast, face, and left thigh also matched defendant's DNA. Items taken from J.R.'s bedroom, including her underwear, blanket, and pillow cases, contained sperm matching defendant's DNA.

## 3. H.S.'s Testimony

H.S. and J.R. were close friends when the two were in middle school. In December 2015, when they were both in the sixth grade, J.R. told H.S. about "what [defendant] was doing to her." J.R. told H.S. that if J.R. wanted something, like candy, she had to do something for defendant in return, such as orally copulate him. J.R. also reported that she would wake up in the

---

[2]     The forensic officer testified that the chance the DNA profile belonged to someone other than J.R. was one in a centillion.

middle of the night and find defendant on top of her, "near her private area." On other occasions, J.R. would report that defendant was "doing it again." H.S. encouraged J.R. to report defendant. J.R. responded that if H.S. told anyone about the abuse, J.R. would stop being her friend.

In the spring of 2018 (after defendant was arrested for abusing J.R.), J.R. told H.S. that she had received a letter from defendant asking her to help him get out of jail. J.R. told H.S. that she felt guilty that defendant was in jail.

In the beginning of the ninth grade, J.R. told H.S. that she had made up the abuse. H.S. reminded J.R. that J.R. had been crying about defendant's abuse for years. H.S. and J.R. are no longer friends and J.R. has blocked H.S. from all contact with her.

### 4. S.A.'s Testimony

S.A. and J.R. were friends in middle school. In sixth grade, a month after winter break, J.R. told S.A. that according to defendant, the only way J.R. could prevent becoming pregnant from arm wrestling was to have sex with defendant. J.R. regularly told S.A. that defendant was forcing her to have sex with him, and that this was occurring on a weekly basis. J.R. said that she was tired of the abuse and wanted to take her own life.

### 5. Police Interview of Defendant

On August 29, 2017, defendant was interviewed by a police detective. The interview was audio recorded and played for the

6

jury. Defendant initially denied abusing J.R., but said that he "deserve[d] whatever happens." In describing his conduct, defendant stated, "But what I did to my daughter, by the way, is just, I was hurt. I, I'm not a pedophile."

Defendant then admitted to forcing J.R. to orally copulate him and explained that he did so because he was angry that she had a boyfriend. He directed J.R. not to tell anyone what he had done and then had intercourse with J.R. twice later that same night.

Defendant further admitted that he would have sex with J.R. "whenever [they were] alone." Defendant recounted an incident in June 2017 when he massaged her, digitally penetrated her, and engaged in intercourse with her because he believed she enjoyed it. Defendant stated, "I realize that I really deserve it. [¶] . . . [¶] I'm not even trying to defend myself." Defendant began touching J.R. when she reached puberty at age 11 or 12.

6. <u>Jailhouse phone calls</u>

Defendant called his wife A.R. more than 1,000 times while in custody. On September 1, 2017, A.R. told defendant: "'You have an illness mentally. That's why you were able to do this.'" Defendant agreed, stating, "'Yes. It's so.'" A.R. also said, "'I really pity [J.R.],'" to which defendant responded: "'Me, too. I pity her so much. That's why, you know, I had long-waited to turn myself in.'"

### 7. J.R.'s Recantation

On October 25, 2018, J.R. told a police officer that she had lied about defendant abusing her.  According to J.R., defendant had cheated on her mother and directed J.R. to tell the police that he had raped her so that he could go to jail.

At the December 7, 2018, preliminary hearing, J.R. refused to answer most questions.[3]  J.R. repeatedly stated that defendant did not do anything and that she had lied.  J.R. testified she made up the allegations because she was mad at defendant for cheating on her mother.  J.R. denied ever telling her friends that defendant had abused her.

### 8. Dr. Susan Hardie

Susan Hardie is a developmental psychologist who testified about child sexual abuse accommodation syndrome (CSAAS).  Hardie described CSAAS as a model for psychologists to disabuse common misconceptions about how child sexual abuse victims behave.  Among other things, child victims often delay reporting sexual abuse until adolescence and first report the abuse to their friends.  Hardie also explained that children often retract their allegations of abuse when their family is "blown to pieces."  Further, child victims feel guilt and shame for, in their view, having caused the abuse.

---

[3]     J.R.'s preliminary hearing testimony was read to the jury because she was unavailable to testify at trial.

## 9. Computer evidence of child sexual abuse material

United States Secret Service agent Paul Thomas testified that he and other members of the Los Angeles Electronic Crimes Task Force searched defendant's digital devices for images and data. Thomas had six years of experience conducting computer forensic examinations and had specialized training and experience in child pornography investigations. Thomas searched defendant's computers for the terms: "PTHC," which stands for preteen hardcore; "Lolita," which is a common child pornography-related search term; and "pedophile." These searches yielded at least 39 internet artifacts (files, programs, documents, or texts). Thomas also inspected the computers for prior Google searches and found 55 searches related to child pornography topics.[4] Thomas also observed that defendant had visited a particular website called motherless.com and had "hit" 266 titles of videos associated with that site.[5]

Thomas also found carved video files, which are remnants of deleted files. One such file was a video that included sexually explicit images of fingers digitally penetrating the vagina of a "very, very young" girl, as well as a close-up of the victim's vagina. The exhibit was marked but not shown to the jury. Thomas testified that based on the size of the vagina compared to

---

[4] These searches included: "real incest fuck," "middle-schoolers having sex," "is a 12-year old a child," "why is incest illegal," "why middle school girls are hot," "incest mainstream movies," "real father-daughter sex," and "nonconsensual sex."

[5] The videos included "Dad fucks Daughter Video Claim," "Dad Fucks Daughter While Mom is Working," and other similar titles.

the size of the hand and the absence of pubic hair, he believed that the victim was a child.

Detective Jerry Kowalsky was also a member of the Los Angeles Electronic Crimes Task Force and conducted a search of defendant's cell phone. On August 9, 2017, someone using defendant's cell phone conducted nine searches related to incest and rape of a daughter. On August 29, 2017 (the day after defendant's most recent rape of J.R.), someone using defendant's cell phone searched how Plan B worked, how long sperm took to swim, and how long sperm could survive outside the body.

C.    *Defense Evidence*

Defendant testified at trial. He admitted to conducting the Google searches about which Thomas testified but explained that he did so because he wanted to create something "cinematic" about incest between a stepfather and daughter. When asked about one of the items retrieved from his computer entitled "'R@ygold, kinderficker PTHC Child Lover Cum Three Year Old Jennifer,'" defendant explained that he visited this site because J.R. told him about it when she was eight or nine years old. Defendant explained that he thought "PTHC" was short for "pathetic" and, even though that search term appeared hundreds of times across his digital devices, he had no idea that it was short for "'preteen, hard[]core'" until he heard Thomas's testimony. As to the telephone search about Plan B, defendant testified that he conducted that search because he wanted to purchase the medication for his girlfriend.

According to defendant, he falsely confessed to raping J.R. because he did not want J.R. to get in trouble for lying to the

10

police and because he was afraid that his wife would find out that he had cheated on her.

Defendant claimed that he told J.R. what to say to the police and went over the details of the story with her so that their statements to the police would match. He then spat on her hand and told her to rub it wherever she wanted, her "'body . . . boobs, whatever.'"

A defense investigator testified about her interview with J.R.; J.R. told the defense investigator that she had found a condom in the trash can of the bathroom and poured the contents of it onto her legs.

## III. DISCUSSION

Defendant contends that the trial court erred by admitting evidence that he possessed images of child pornography and conducted searches for child pornography.[6] "A trial court's

---

[6]     Evidence Code section 1101, subdivision (b) provides: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

Evidence Code section 1108, subdivision (a) provides, "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [Evidence Code] [s]ection 1101, if the evidence is not inadmissible pursuant to [Evidence Code] [s]ection 352."

11

rulings admitting evidence under Evidence Code sections 1101 and 1108 are reviewed for abuse of discretion." (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 824.)

A.    *Background*

Prior to trial, defendant moved to exclude evidence seized during the search of his digital devices. The prosecutor argued that the images and search terms were admissible pursuant to Evidence Code section 1108. The prosecutor conceded that introduction of the actual images of child pornography would be "inherently inflammatory" and therefore offered to limit the evidence to testimony about the images. Defense counsel contended that the images were not of children but adults and requested that the court view the videos to determine whether they depicted children. The prosecutor then submitted still images from four videos for review by the court.[7] The court reviewed the images and concluded that they depicted children, not adults. As we discussed above, the prosecution ultimately elicited testimony about just one of the videos, which depicted the digital penetration of a child victim. As to this image, the court concluded that it "clearly show[ed] digital penetration of a young person's sex organs." The court ruled that defendant's possession of the images was admissible under Evidence Code section 1108 but limited the evidence to testimony about the images and excluded admission of the actual images, pursuant to Evidence Code section 352. The court also concluded that the search terms

_____

[7]    Only the stills from the single video about which the prosecution elicited testimony is in the record. The stills of the other three videos are not part of the record on appeal.

12

were admissible pursuant to Evidence Code section 1101, as evidence of motive.

Defense counsel never articulated to the trial court why the Google search terms should not be admitted at trial.

B.    *Analysis*

Defendant contends that evidence regarding the files, including images, seized from his computers and telephone as well as the search terms "did not qualify as admissible criminal disposition evidence under [Evidence Code] section 1108, were insufficiently probative under [Evidence Code] section 1101[,] subdivision (b), and were unduly prejudicial under [Evidence Code] section 352." "'In determining the admissibility of evidence, the trial court has broad discretion . . . .'" (*People v. Jackson* (2016) 1 Cal.5th 269, 320.)

Defendant never articulated before the trial court why the Google search terms were inadmissible and has arguably forfeited that argument on appeal. (*People v. Fuiava* (2012) 53 Cal.4th 622, 670.) Even if not forfeited, we reject defendant's argument on its merits. Testimony about the images and search terms was admissible pursuant to Evidence Code section 1101, subdivision (b). The information charged defendant with three counts of sexual penetration of J.R. As the court instructed the jury, the prosecution was required to prove that when defendant sexually penetrated J.R., he did so "for the purpose of sexual abuse, arousal, or gratification." Accordingly, defendant's search for and possession of child pornographic images was relevant to defendant's motive and intent. (Evid. Code, § 1101, subd. (b); see also *People v. Brown* (2004) 33 Cal.4th 892, 901 ["If a judgment

13

rests on admissible evidence it will not be reversed because the trial court admitted that evidence upon a different theory"].)

Further, to the extent defendant argues that admission of this evidence was unduly prejudicial, we disagree. The testimony regarding the search terms and images was relatively brief, especially compared to the numerous witnesses who testified about defendant's abuse of J.R. We also disagree with defendant's contention that jurors were likely to find defendant's possession of child pornography more repugnant than defendant's years-long and multiple acts of rape against his daughter. We thus agree with the trial court that the admission of such evidence was not unduly prejudicial. (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1117; accord, *People v. Hernandez* (2011) 200 Cal.App.4th 953, 965–966.)

Finally, even if the trial court had abused its discretion in admitting the evidence, and we conclude it did not, any such error was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) As detailed above, J.R.'s recorded statements to the police, her statements to her friends, defendant's recorded confession to the police, defendant's jailhouse calls to his wife, the inherent implausibility of defendant's testimony at trial, and physical evidence demonstrating recent trauma to J.R.'s vagina, coupled with DNA evidence corroborating defendant's rape of J.R., constituted overwhelming evidence of defendant's guilt.

14

## IV.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


KIM, J.


We concur:


RUBIN, P. J.


BAKER, J.