Filed 3/28/23 In re K.Z. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re K.Z., a Person Coming Under the Juvenile Court Law. | B318145 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>D.Z.,<br><br>      Defendant and Appellant. | (Los Angeles County Super. Ct. No. 21CCJP04512E) |

APPEAL from orders of the Superior Court of Los Angeles County. Terry T. Truong, Judge. Reversed and remanded.

David M. Yorton, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

_____

**INTRODUCTION**

Appellant D.Z. (Father) challenges the juvenile court's jurisdictional and dispositional orders of January 26, 2022. The juvenile court asserted jurisdiction over then four-year-old K.Z. after finding Father had a long-standing and unresolved history of violent behavior that placed K.Z. at risk of serious physical harm under Welfare and Institutions Code section 300, subdivision (b)(1).[1] It also found jurisdiction over K.Z. based on K.Z.'s mother's (Mother) failure to protect, and conduct by the father toward some of K.Z.'s siblings.

Father appealed, contending that the evidence does not support the jurisdictional finding as to him, and that the court inappropriately shifted the burden of proof to him.[2] Mother did not appeal.

We reverse, concluding there is insufficient evidence of a nexus between Father's past violent acts and risk of serious physical harm to K.Z.

**FACTUAL AND PROCEDURAL BACKGROUND**

Father is the presumed Father of K.Z. K.Z. was born in January 2018.

**I.     Petitions and Detention Hearing.**

K.Z. is one of Mother's five children who were subject to the dependency petition. The other children have different fathers than K.Z. Only K.Z. is the subject of this appeal.

---

[1]     All subsequent statutory references are to the Welfare and Institutions Code.

[2]     We do not address Father's argument as to burden because we find in his favor that the evidence in support of jurisdiction was insufficient.

In September 2021, the Los Angeles Department of Children and Family Services (DCFS) filed a petition after a report by one of K.Z.'s siblings that the sibling's father sexually abused her. This petition did not mention Father.

In November 2021, DCFS filed a first amended petition that added allegation "b-7." This is the only allegation regarding Father. That same month, DCFS filed a second amended petition. This petition had the same allegation as to Father, except that it inserted Father's name into the count. Count b-7 read:

"The child [K.Z.]'s father, [D.Z.], has a long-standing and unresolved history of violent behavior, including a history of convictions which include participat[ing] in criminal street gang activity, robbery in the second degree which resulted in a [nine] year prison term, force/assault with a deadly weapon not a firearm, which resulted in a two year prison term, and wet reckless driving. The father [D.Z.]'s unresolved history of violent behavior endangers the child's physical safety and emotional health, safety and well-being and creates a detrimental home environment, placing the child [K.Z.] at risk of physical and emotional harm and damage."

At the detention hearing held on September 30, 2021, the juvenile court detained K.Z. from Father. K.Z. remained in the care of Mother.

## II.    Prior Referrals Involving Father.

In October 2019, a reporting party reported domestic violence between Mother and Father. When questioned by DCFS, both parents denied the allegations. Mother specifically denied being afraid of Father, denied that he raped her, and denied that he had kidnapped "the baby." DCFS found no

evidence of physical abuse. The referral was closed as unfounded.

In January 2020, DCFS contacted Mother based on reports that Father emotionally abused K.Z. This referral was deemed inconclusive after DCFS was unable to make contact with the family.

In March 2021, DCFS received a referral that Father emotionally abused K.Z. and his siblings. The referral stated that Father lived with his "new girlfriend." Mother reported that Father "usually" had " 'exchanging words' " with his girlfriend when Mother went to pick up K.Z. Mother reported that Father told her that on one occasion he had to "knock" his girlfriend "out." Father denied that he and the girlfriend argued in K.Z.'s presence. The referral was closed as inconclusive.

## III. Investigation.

### A. Statements by Father.

In December 2021, Father filed a statement regarding parentage. In it, he outlined his activities with K.Z., which included playing in the park, going to the beach, going to carnivals, shopping, reading, coloring, and attending medical and dental appointments. He also stated that he provided clothing, food, and shelter for K.Z. Father reported that after K.Z. was born, he, Mother and K.Z. lived together on and off, for approximately two years. He stated that K.Z. lived with him from January through April 2021. He also used FaceTime to call K.Z. when he was not with him.

DCFS interviewed Father twice. In November 2021, Father reported that he was now residing in Arizona and had been there for five months. He stated that all he had on his

4

record was a robbery conviction from when he was younger and went to prison for seven years.

## B. Statements by Mother.

In DCFS interviews with Mother, Mother reported that Father was aggressive and he had hit her on one occasion, but she could not remember if law enforcement was involved. Mother also reported that Father raped her. Mother told DCFS that Father had made "death threats" to her current partner. Finally, Mother reported that Father had "broken" into her apartment once and "took" K.Z. The record does not indicate when any of these events took place.

Mother also said that she was afraid of Father. She said she went to Arizona to give birth to a second child she had with Father because she was afraid Father would force himself on her.

According to Mother, K.Z. had never lived with Father. In November 2021, Mother reported that sometime in "April" (of what year is unclear) K.Z. had slept over at Father's house "frequently" for about three weeks. Mother denied K.Z. having any regular contact with Father.

Mother also reported that Mother and Father are no longer together and had not been together since the end of 2018.

Prior to this dependency proceeding, there were no custody orders in place regarding K.Z., and Mother and Father shared custody.

## C. Father's Criminal Convictions.

Father's criminal history reflects numerous arrests, warrants, probation violations, and felony convictions. In 2004, Father was convicted of taking a vehicle without the owner's consent. In 2008, Father was convicted of participating in street gang activity and of second degree robbery. In 2016, Father was

5

convicted of an unspecified charge. In 2017, Father was convicted of felony assault with a deadly weapon with force likely to produce great bodily injury. That same year, Father was also convicted of false imprisonment. In 2019, Father was convicted of reckless driving for driving under the influence.

## IV. Jurisdiction and Disposition.

The juvenile court held a combined adjudication and disposition hearing on January 26, 2022.

The court sustained allegation b-7 as pled. It found that "[w]ith regards to count b[-]7 and [father], while a parent['s] criminal history alone is not sufficient for the court to sustain a count, I do believe in this case [father's] criminal history is relevant to his conduct and the mother's fear of [father] as well as his relationship—or non-exist[ant] relationship with K.Z. at this point. His criminal history which includes robbery and assault with a deadly weapon are—a history that would place a three year old in danger given that I have no evidence presented by [Father] to show me that he has redeemed or that he has resolved the issues that resulted in his convictions."

The court then moved to disposition and removed K.Z. from Father. The court ordered enhancement services and parenting classes for Father. Upon Father's counsel's request, the juvenile court struck case plan requirements, recommended by DCFS, that Father attend anger management classes.

This appeal by Father followed. Mother did not appeal.

## V. Father's Request for Judicial Notice of Final Orders.

Father requests that we take judicial notice of the September 14, 2022 Judicial Review Hearing Order and Restraining Order-Juvenile, and the September 19, 2022 Juvenile Custody Order Hearing Minute Order and Custody

6

Order Final Judgment. We grant the request and take judicial notice of the information in these final orders because they are records of a court of this state and are relevant to the question of justiciability. (See Evid. Code, § 452, subd. (d); *Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 748, fn. 6 [courts will take judicial notice of only relevant matter].) Specifically, they are relevant to the question of possible prejudice to Father from the jurisdictional order. In the relevant Final Orders, the juvenile court terminated jurisdiction and granted Mother sole legal and physical custody of K.Z. We decline to take judicial notice of the other orders because they are not relevant to whether we should review this decision on the merits, which is the purpose of Father's request for judicial notice.

## DISCUSSION

Father contends that the evidence does not support the juvenile court's exercise of jurisdiction under section 300, subdivision (b)(1) over K.Z. based upon Father's actions. Father also argues that the juvenile court erred in shifting the burden of proof to him from DCFS. He further asserts that we should review the merits of his appeal because the jurisdictional finding against him served as the basis for the dispositional order removing K.Z. from Father, and the order could be prejudicial to Father. Father also appeals the dispositional order, arguing it should be reversed because the jurisdictional order was in error.

DCFS argues that the evidence supports the juvenile court's jurisdictional finding as to Father and the court did not shift the burden of proof to Father.

## I. Father's Appeal Is Justiciable.

We begin by addressing whether Father's appeal is justiciable.

Father appealed the juvenile court's assumption of jurisdiction, but the juvenile court terminated jurisdiction in September 2022. Our Supreme Court recently clarified that even where the juvenile court has terminated jurisdiction, where a jurisdictional finding serves as the basis for dispositional orders that are also challenged on appeal, "the appeal is not moot." (*In re D.P.* (Jan. 19, 2023, S267429) 14 Cal.5th 266 at p. 278 (*In re D.P.*).) Father's appeal of the jurisdictional order has therefore not been rendered moot by the juvenile court's subsequent termination of jurisdiction.

In addition, the juvenile court assumed jurisdiction over K.Z. not only due to Father's actions alleged in count b-7, but also by sustaining a count regarding Mother and several counts involving the father of some of Mother's other children. Mother does not appeal. "[W]here jurisdictional findings have been made as to both parents but only one parent brings a challenge, the appeal may be rendered moot." (*In re D.P.*, *supra*, 14 Cal.5th at p. 285.) Regardless, still we have discretion to address the merits of a jurisdictional challenge by only one parent, where, as here, the jurisdictional ruling has impacted current dependency proceedings or could otherwise be prejudicial to the appellant. (*Id.* at p. 286)

Here, in sustaining count b-7, the juvenile court found that Father had a long-standing and unresolved history of violent behavior that endangered K.Z. This finding was the basis for the dispositional order removing K.Z. from Father's custody, so it has impacted the current dependency proceeding. (See *In re D.P.*, *supra*, 14Cal.5th at p. 286.) In addition, the juvenile court in its final orders gave Mother sole legal and physical custody, with monitored visitation for Father. This is also evidence of an

impact on the current proceedings and prejudice to Father. We therefore exercise our discretion to consider Father's appeal even though Mother did not appeal.[3]  (See *ibid*.)

## II.     Standard of Review.

We review the juvenile court's jurisdictional findings and dispositional orders for substantial evidence. (*In re R.T.* (2017) 3 Cal.5th 622, 633 (*R.T.*).)  We draw all reasonable inferences in favor of the findings and orders of the juvenile court. We do not reweigh the evidence or reassess credibility. (*Ibid*.) "Substantial evidence is evidence that is 'reasonable, credible, and of solid value'; such that a reasonable trier of fact could make such findings." (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.) Substantial evidence " 'is not synonymous with any evidence. [Citations.] A decision supported by a mere scintilla of evidence need not be affirmed on appeal.' " (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.)

## III.    Substantial Evidence Does Not Support the Juvenile Court's Jurisdictional Finding.

The record does not contain substantial evidence to support the juvenile court's jurisdictional finding under section 300, subdivision (b)(1).

Under section 300, subdivision (b)(1), a juvenile court may exercise jurisdiction over a child if the "child has suffered, or there is a substantial risk that the child will suffer, serious

---

[3]     DCFS filed its brief on October 14, 2022, *after* the juvenile court terminated jurisdiction on September 19, 2022. DCFS did not argue that we lack jurisdiction, or otherwise assert that we should dismiss Father's appeal as moot. We take this as an indication that DCFS has no objection to our review of this matter on the merits.

physical harm or illness, as a result of . . . [¶] [t]he failure or inability of [his or her] parent . . . to adequately supervise or protect the child,' or by "[t]he inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse." (§ 300, subd. (b)(1).)

A jurisdictional finding under section 300, subdivision (b)(1), requires DCFS to demonstrate the following three elements by a preponderance of the evidence: (1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness. (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561; see also *R.T.*, *supra*, 3 Cal.5th at p. 624.) These elements must be established as of the time of the jurisdictional hearing. (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022.) "[P]revious acts . . . , standing alone, do not establish a substantial risk of future harm; there must be some reason beyond mere speculation to believe they will reoccur." (*In re Emily L.* (2021) 73 Cal.App.5th 1, 15, citing *In re Ricardo L.* (2003) 109 Cal.App.4th 552, 565.)

We find insufficient evidence that at the time of the jurisdictional hearing, K.Z. was at substantial risk of serious harm due to Father's violent history. The evidence of Father's violent history consists of his criminal convictions, domestic violence concerning Mother and his girlfriend, death threats to Mother's "current" partner, and breaking into Mother's house to take K.Z. But the record does not establish a nexus between these acts and a substantial risk of serious physical harm to K.Z. at the time of the jurisdictional hearing. With the exception of the break-in, there is no evidence that K.Z. or any child was

10

present or otherwise at-risk during Father's prior violent acts. Additionally, the record does not indicate when many of Father's acts took place. We therefore cannot conclude on this record, which is largely devoid of dates and pertinent details, that there is substantial evidence that at the time of the jurisdictional hearing Father's violent history posed a substantial risk of serious harm to K.Z.

As the trial court recognized, Father's criminal history, standing alone, is insufficient to establish jurisdiction. DCFS " 'has the burden of showing specifically how the minor[] ha[s] been or will be harmed' " (*In re J.N.* (2021) 62 Cal.App.5th 767, 775), which requires showing "an actual nexus" between the parent's conduct "and any specifically identified, substantial, current risk of serious physical harm" (*ibid.*) to the child. Father has an extensive criminal history. But Father's criminal history does not give rise to an inference that K.Z. faces a specifically identified, substantial risk of harm. (See *ibid.*) There is no evidence that Father's crimes harmed or put K.Z. or any child at risk of harm. There is no evidence any of his crimes involved children or were in the presence of children. Thus, it is speculative to conclude that any future criminal conduct by Father will put K.Z. at substantial risk of serious harm. (See *id.* at p. 776 ["although we acknowledge that, on an abstract level, violent crime is incompatible with child safety, DCFS cannot use such generalities to satisfy its burden of proving an 'identified, specific hazard in the child's environment' that poses a substantial risk of serious physical harm to him"], italics omitted.)

There is also evidence that Father engaged in domestic violence with Mother. There is evidence that Father raped

11

Mother and hit her on one occasion. In cases of domestic violence, there can be a finding of a nexus between past violence and a risk of future violence to the child sufficient to support jurisdiction under section 300, subdivision (b)(1). (*In re Jesus M.* (2015) 235 Cal.App.4th 104, 112–113; *In re R.C.* (2012) 210 Cal.App.4th 930, 941; *In re E.B.* (2010) 184 Cal.App.4th 568, 575–576.) Jurisdiction can be appropriate under section 300, subdivision (b)(1), because "[c]hildren can be 'put in a position of physical danger from [domestic] violence' because, 'for example, they could wander into the room where it was occurring and be accidentally hit by a thrown object, by a fist, arm, foot or leg . . . .' " (*In re E.B.*, at p. 576.) But the existence of past domestic violence alone is not enough to support jurisdiction. DCFS must provide evidence that the domestic violence is "ongoing or likely to continue" and that it "directly harmed the child physically or placed the child at risk of physical harm." (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 717 (*Daisy H.*), disapproved of on another ground in *In re D.P., supra,* 14 Cal.5th at p. 278; accord, *In re M.W.* (2015) 238 Cal.App.4th 1444, 1453.) Here, there is no evidence that the domestic violence between Father and Mother directly harmed K.Z. or placed him at risk of physical harm because there is no evidence as to his whereabouts when the domestic violence took place.

It is also unclear *when* the domestic violence between Mother and Father took place, such as to support a finding that it is ongoing or likely to continue. There was a report of domestic violence in 2019, which was found unfounded. Mother told DCFS that her relationship with Father was over by the end of 2018. Father was not convicted of any crime involving domestic violence. Drawing all inferences in favor of the juvenile court's

12

decision as we must, there is no evidence that Father's domestic violence against Mother continued past 2019. Father and Mother are no longer together, so any assumption that their domestic violence will reoccur, and that it will place K.Z. at harm, is speculation. (Cf. *In re Ma.V.* (2021) 64 Cal.App.5th 11, 21 [reversing the juvenile court because its findings were based on "stale" acts of domestic violence that had occurred on an ongoing basis but had last occurred 10 months earlier, and the relationship between Mother and the abuser had ended].) In other words, the parents' domestic violence does not support jurisdiction because there is "no evidence that [K.Z. was] physically exposed to the past violence between [the parents] and no evidence of any ongoing violence between the parents who are now separated." (*Daisy H., supra*, 192 Cal.App.4th at p. 717.)

There is also evidence of domestic violence between Father and a girlfriend. This girlfriend was Father's "current" girlfriend as of March 2021, but we do not know if their relationship continued. In March 2021, Mother reported that Father "usually" had " 'exchanging words' " with this girlfriend when he came to Mother's residence to pick up K.Z. She also said that Father told Mother on one occasion that he "knock[ed]" his girlfriend "out." The record does not reflect whether K.Z. was present when Father knocked his girlfriend out. Nor is there any evidence that the relationship between Father and the girlfriend ever harmed K.Z. or placed him at risk of physical harm. (*In re Cole L.* (2021) 70 Cal.App.5th 591, 606 [no evidence that domestic violence incident took place in presence of the children, so physical danger was minimal].) Moreover, the timing of this domestic violence between Father and his girlfriend was unclear as Mother did not provide a date or timeframe for the acts.

In addition, there is no evidence it was likely to continue as of the time of the jurisdictional hearing in late January 2022. (See *In re Ma.V.*, *supra*, 64 Cal.App.5th at p. 21.) Instead, the evidence suggests otherwise. Father previously lived with this girlfriend in San Bernadino, California. At the time of the jurisdictional hearing, however, Father had been living in Arizona for at least seven months. As DCFS stated in the Jurisdiction/Disposition Report, "Father resides in Arizona and it is unclear as to the amount of involvement he has had in the child [K.Z.'s] life."

Father also made death threats to Mother's "current" partner, which Mother reported to DCFS in November 2021. There is no evidence of a nexus between these threats and a specific, serious risk of substantial harm to K.Z. at the time of the jurisdictional hearing. (See *In re J.N.*, *supra*, 62 Cal.App.5th at p. 775.) Like Father's criminal history, although the death threats suggest a risk that Father could be violent to Mother's partner, there is no evidence of a specific risk of harm to K.Z. While on an "abstract level" death threats certainly are "incompatible with child safety . . . such generalities" are not evidence of an " 'identified, specific hazard in the child's environment' that poses a substantial risk of serious physical harm to him." (*Id*. at p. 776, italics omitted.) The conclusion that Father would have carried out such an act in a way that would have placed K.Z. at risk of harm is "mere speculation." (*In re Emily L.*, *supra*, 73 Cal.App.5th at p. 15; *In re J.N.*, at p. 776.) Moreover, because we do not know when these threats took place, we do not know if they posed a current threat to K.Z. at the time of the jurisdictional hearing.

Finally, we address Father's break-in. Mother stated that Father broke into her home and took K.Z. This is evidence of a

potentially violent act by Father for which K.Z. was present. There is no evidence that K.Z., or anyone, was actually harmed or at risk of being harmed. There is no evidence of how Father entered the home, or in what context. The record is bereft of any details that could potentially provide evidence of a risk of harm to K.Z. In addition, the parents shared custody of K.Z. at the time, so the simple fact of Father taking K.Z. does not raise an inference that Father placed him at substantial risk of serious physical harm. Thus, the only inference of violence and risk of harm to K.Z. is the fact that Father "broke in."

Moreover, we do not know when this event took place. The evidence we do have suggests it may have taken place in 2019, when Mother refuted a reported kidnapping by Father. This is approximately three years before the jurisdictional hearing. There is no pattern of Father taking K.Z. without permission or breaking into a home where K.Z. or any child is present. There is no reason beyond mere speculation to believe that Father would break into Mother's home and take K.Z. again.

DCFS makes various arguments that there is substantial evidence to support the juvenile court's jurisdictional finding as to Father. First, DCFS argues that Mother's allegations must be taken as credible, and we agree.

Second, DCFS argues that Father's criminal history is not stale, pointing to his conviction for false imprisonment and assault with a deadly weapon in 2017, and to his 2019 conviction for driving under the influence. In the four years between K.Z.'s birth and the jurisdictional hearing, Father's only conviction was for driving under the influence. There is no indication that K.Z. was in the car when this took place. There is no evidence of a nexus between Father's reckless driving and harm to K.Z. at the

15

time of the jurisdictional hearing approximately three years later.  For example, there is no evidence that Father continued to drive under the influence.  (Cf. *In re L.W.* (2019) 32 Cal.App.5th 840, 850 ["That there were two arrests and at least one conviction [for driving under the influence] *within a year of the referral* shows Mother's substance abuse is now spilling over into areas that will pose a substantial risk of physical harm to L.W."], italics added]; see also *In re Rebecca C.* (2014) 228 Cal.App.4th 720, 728 [rejecting argument that physical harm to a child is "presumed from a parent's substance abuse under the dependency statutes"], italics omitted.)

Finally, DCFS points to K.Z.'s young age at the time of the jurisdictional hearing.  DCFS argues that K.Z. was too young to protect himself from Father's relatively recent criminal convictions, and therefore jurisdiction is warranted.  In support, DCFS cites *In re Christopher R.* (2014) 225 Cal.App.4th 1210, which is inapplicable.  *In re Christopher R.* concerned a mother with a seven-year history of drug abuse, including while pregnant.  There was evidence of direct harm to the child by the mother ingesting drugs while pregnant and some evidence the mother was not properly caring for her children due to drug use.  (*Id.* at pp. 1212–1213, 1217–1219.)  Here, there is no evidence that Father's remote criminal acts that occurred outside of any child's presence had any impact on K.Z.'s physical safety, or were likely to place him at risk in the future.

We recognize that Father has a long history of violent acts.  But the record is devoid of evidence that these acts have a nexus with substantial risk of serious harm to K.Z.  While we are deeply concerned by the evidence that Father raped Mother, and hit Mother and his girlfriend each once, there is no evidence K.Z. was

16

present for any of these events. The record is devoid of detail that discloses the timing of these acts or any facts to elucidate any potential nexus to support jurisdiction. This may be a failure to compile an adequate record by DCFS, but we must take the facts as we find them. Although we can draw reasonable inferences in favor of the juvenile court's decision, we cannot draw inferences where there is no evidence to support them. We are also troubled that Father broke into Mother's home and took K.Z., but there is no detail in the record regarding this event, and the timing of this break-in appears to be years old. With no evidence that K.Z. was at risk of harm from the break-in or that this stale act was likely to reoccur, this fact does not support jurisdiction. Additionally, with a record largely devoid of dates and specifics, we cannot find that on the whole, Father's past violent acts were not stale at the time of the jurisdictional hearing. A decision supported by a " 'mere scintilla of evidence need not be affirmed on appeal.' " (*In re Yolanda L.*, *supra*, 7 Cal.App.5th at p. 992.)

In sum, the record does not support an actual nexus between Father's violent history and any specifically identified, substantial, risk of serious harm to K.Z. at the time of the jurisdictional hearing such as to support the juvenile court's jurisdictional finding under section 300, subdivision (b)(1).

## IV. Dispositional Order.

Father contends that because the juvenile court's jurisdictional finding was improper, the dispositional order premised on the findings must be reversed. We agree. Because we reverse the juvenile court's jurisdictional findings, we also reverse the dispositional order. (See *In re E.B.*, *supra*, 184 Cal.App.4th at p. 578, disapproved of on other grounds in

17

*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1003, fn. 4 [holding substantial evidence standard of review applies to jurisdictional findings and dispositional orders].)

## DISPOSITION

The jurisdictional order of the juvenile court is reversed as to Father and its related findings are vacated. The matter is remanded to the juvenile court with directions to dismiss the petition as to Father.

VIRAMONTES, J.

I concur:

STRATTON, P. J.

**WILEY, J., Dissenting.**


Substantial evidence supported the finding that the father's unresolved history of violence put his son K.Z. at risk of harm. The evidence is in three categories.

I

First are witness statements about the father.

1. The father broke into the mother's apartment and took K.Z., who is the subject of this appeal.
2. The father committed domestic violence against the mother.
3. He raped her.
4. She fled to another state for fear he would "find me and force himself upon me."
5. He hit her.
6. He threatened to kill her current male companion.
7. He knocked out his new girlfriend.
8. K.Z.'s mother is afraid of him.
9. He is a very aggressive person.
10. He was very upset the mother told the Department he is aggressive.
11. He has a violent temper.
12. He told the Department "All I have on my record is a robbery case when I was younger." That was not so, as will appear shortly.

At the adjudication hearing, the father was present with his attorney. The court asked how the father would like to proceed. The father's attorney declined to offer witnesses or evidence on the father's behalf.

1

## II

The record contains the father's 15-page criminal history, which began when he was 11 years old and has continued for more than two decades.

1. His juvenile record contains many clashes with the law, including a wardship for battery with serious bodily injury.
2. At age 21, he was cited for criminal violation of a court order, but the case was dismissed for lack of evidence.
3. When the father was 23, he was convicted of multiple crimes, including robbery, assault with a gang allegation, and vehicle theft. He received multiple sentences, resulting in a combined term of nine years. The father went to prison.
4. By age 30, he was out of prison and back in legal trouble. He was arrested for domestic violence and was granted probation on a reduced charge of felony false imprisonment.
5. At age 32, he was convicted of assault likely to cause great bodily injury – also a violation of his probation. The father received a two-year sentence for these offenses and went back to prison.
6. At age 34, when K.Z. was a one-year-old, the father faced charges of driving under the influence. He was convicted of reckless driving, went to jail, and received another three years' probation.

## III

The third category of evidence is three previous complaints to the Department about the father's physical and emotional abuse of the young child K.Z.

1. The father was reported in October 2019 for emotionally abusing K.Z.. The reporting party was concerned that the

father was physically abusing the mother and that K.Z. and his siblings would suffer emotional or physical abuse during these episodes of domestic violence. The mother denied all the accusations, and the Department concluded the report was unfounded.

2. He was reported in January 2020 for emotionally abusing K.Z. An investigator spoke to the mother on the telephone "but the mother ended the communication and would not answer any further contact." The Department eventually deemed the matter "inconclusive" because there was no other way to contact the family.

3. He was reported in March 2021 for emotionally abusing the mother's five children, including K.Z. The Department disposed of the report as "inconclusive" but gave no explicit reason for this conclusion.

This pattern, including the mother's denials, is not *no* evidence. It is *some* evidence.

This pattern is familiar to bench officers in juvenile courts who hear and learn about domestic violence in many, many cases.

Domestic violence is violence between people living together in an intimate relationship. (*People v. Brown* (2004) 33 Cal.4th 892, 895, fn. 1 (*Brown*).) Domestic violence is a serious social and legal problem in the United States, occurring in every economic, racial, and ethnic group. Compared to other crimes, domestic violence is vastly underreported. Until recent decades, it was largely hidden from public examination. A fundamental difference between domestic violence and other violence (such as street violence) is domestic violence happens within ongoing relationships expected to be protective, supportive, and nurturing. The ties between victim and abuser often are strong emotional

3

bonds, and victims frequently feel a sense of loyalty to their abusers. (*Brown*, *supra*, 33 Cal.4th at pp. 898–899.) Often abusers use psychological, emotional, or verbal abuse to control their victims. (*Id*. at p. 907.) Victims commonly rely on their abusers for financial support for themselves and their children.

Victims who report abuse to authorities may later protect the abuser by denying or recanting their own reports. This presents an exceptional challenge for authorities. (*Brown*, *supra*, 33 Cal.4th at p. 899.)

In the *Brown* case, an expert explained domestic violence victims, after describing the violence to police, often later repudiate their descriptions. There is typically "anywhere between 24 and 48 hours where victims will be truthful about what occurred because they're still angry, they're still scared." But after they have had time to think about it, they commonly change their reports. About 80 to 85 percent of victims recant at some point in the process. Some victims will say they lied to authorities; almost all will attempt to minimize their experience. (*Brown*, *supra*, 33 Cal.4th at p. 897; see also *id*. at p. 903 [quoting another expert who testified that, about 80 percent of the time, a woman who has experienced a first assault by a boyfriend, husband, or lover will recant, change, or minimize her story].)

Denying and recanting are common because they are logical. Victims may still care for their abusers and may be hoping the abuser will not do it again. (*Brown*, *supra*, 33 Cal.4th at p. 897.) The abuser or the abuser's family may be pressuring or threatening the victim. (*Ibid*.)

Professionals familiar with domestic violence understand victims logically may deny or recant to protect themselves because denying or recanting can appease the abuser.

4

The juvenile court was entitled to consider this series of complaints against father about his conduct towards K.Z. as part of the whole record.

IV

This substantial evidence supports the juvenile court's finding.

The father says there is no nexus to the child. This claim disregards his taking of K.Z., or reimagines it in some way contrary to the standard of review.

The nonconsensual taking of a young child from his mother in her apartment is hardly benign. This child was present when the father took him. So too was the nonconsenting mother.

Thus a rapist—a rapist with a lengthy and violent criminal history— confronted his rape victim and her young son in their home and took the son from his mother against her will.

To speculate this interaction was anodyne mistakes our standard of review. (See *In re I.J.* (2013) 56 Cal.4th 766, 773 [draw all reasonable inferences to support the dependency court's order; review the record in the light most favorable to that court's determinations; do not reweigh the evidence or exercise independent judgment].)

The father's suggestion this child-taking posed no risk of harm to the young child is against the weight of the evidence. The juvenile court was not required to wait until this young boy is seriously abused or injured to take the steps necessary to protect him. (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)

I would affirm.

WILEY, J.

5