Filed 6/26/24  Frutiger v. Frutiger CA4/1
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| PAOLA FRUTIGER,<br><br>    Respondent,<br><br>    v.<br><br>PAUL FRUTIGER.,<br><br>    Appellant. | D081850<br><br><br>(Super. Ct. No. 20FL001810N) |

APPEAL from an order of the Superior Court of San Diego County, Victor M. Torres, Judge.  Affirmed.

Paul Frutiger, in pro. per., for Appellant.

No appearance by Respondent.

Paul Frutiger appeals a domestic violence restraining order (DVRO) entered against him for the protection of his ex-wife, Paola Frutiger, and their minor child (the child).  He contends that (1) the DVRO is not supported by substantial evidence, (2) the evidentiary hearing that culminated in the DVRO was procedurally deficient, and (3) the duration of the DVRO is excessive.  For reasons set forth below, we disagree.  Hence we affirm.

# I.
## FACTUAL AND PROCEDURAL BACKGROUND

This appeal arises in the context of a fraught relationship between (now- ex) spouses that, over time, has spawned multiple orders against Paul for the protection of Paola and (most recently) the child.[1]  Included among such orders is the one that is the subject of this appeal:  the DVRO.

## A.	*The Application for a DVRO and the Evidentiary Hearing*

In August 2022, Paola completed and filed a form DV-100 request for DVRO.  In response to item 5 on the DV-100 (and item 3 on the accompanying form DV-101), inquiring about the "most recent abuse," Paola described a pair of encounters in a courthouse the previous day in which Paul had behaved toward her in a manner that, in her telling, was aggressive. Where the forms inquired into other incidents of abuse directed at oneself or one's child, she described an occasion in 2018 in which "Paul tried to strangle me" and noted a report she had made to Child Protective Services based on an incident that the child had reported to her earlier the same week.  (We shall refer to these three matters, each of which we discuss *post*, as:  the courthouse incident, the alleged strangling incident, and the alleged child abuse incident.)

In September 2022, the trial court granted Paola's request  for a domestic violence temporary restraining order.  Thereafter, Paul completed and filed a form DV-120 response to Paola's request in which he disputed Paola's allegations and her interpretations of his actions (the DV-120).  He also filed a declaration from an attorney, Jefferson Stacer, who had observed Paul's behavior during a portion of the courthouse incident.

---

[1]	Because the parties share the same last name, we refer to them here by their first names.  We do so for the sake of clarity, intending no disrespect.

2

An evidentiary hearing then transpired over the course of three days in October and November of 2022 and in January of 2023. At the hearing, the trial court heard from six witnesses. These were Paola, Paul, two sheriffs' deputies who had been involved in a portion of the courthouse incident, and two professional supervised visitation monitors who had been involved in a fourth incident (an alleged abduction incident) that did not occur until after Paola had filed the DV-100 and the temporary restraining order had gone into effect.

Paola was represented by counsel on all three days of the hearing. Paul was represented by counsel on just one day of the hearing—the day he testified. The testimony of all but one of the six witnesses—Paola[2]—was reported. During the evidentiary hearing, the trial court heard testimony and received other evidence bearing on each of the four incidents noted *ante*. We briefly summarize the evidence with respect to each of those incidents, in the order in which the incidents occurred.

### 1. The Strangling Incident

The first of the four incidents, chronologically, was the alleged strangling incident. Paola described this incident in the DV-100 as follows:

> "Paul tried to kill me in 2018. He grabbed me by the neck and tried to strangulate me, lift me up in the air and told me fuck you bitch.
>
> "Days later he punched me on my left breast. He flipped the dining table while we were having dinner and scare[d] me and my children. Paul was tak[en] [in]to custody. He pleaded guilty and was sent to 52 weeks of DV classes. He

---

[2]    The record supplies no explanation as to why Paola's testimony at the hearing was not reported. The minute order for the date of Paola's testimony notes in bold underlined italics that, beginning at 1:49 p.m., "[t]he matter is no longer being reported;" and that Paola's testimony began at 2:02 p.m.

was charged with intent [to] murder (felony) but [it] was changed to a misdemeanor DV. I was given a criminal protective order for 3 years. Paul was [on] probation for 3 years."

In his DV-120, Paul denied that such an incident had ever happened, and he expressed a desire that Paola's account of it be "stricken from the evidence." But, in his testimony at the evidentiary hearing, he corroborated much of what Paola had alleged. For example, he acknowledged having been charged with felony corporal injury to a spouse and with assault by means likely to product great bodily injury, having pleaded guilty "to a misdemeanor and domestic violence," and having served time in jail and become subject to a criminal protective order as a result of the incident.[3]

In his defense, Paul testified that he had not punched Paola in the breast, that "picking her up and strangling her . . . absolutely did not happen," that instead he had merely "pushed her back" after she had "poured hot coffee over [his] face and . . . head" following an argument, and that "severe back problems" would have precluded him from being able to do what she said he had done. As for the guilty plea, he attributed it to his attorney "coercing me into doing this as if that was my only option."

Questioned by the trial court on the topic of coercion, Paul testified as follows:

> "Court: You entered . . . a plea of guilty to 273.5 sub (a), right?
>
> "Paul: Correct.
>
> "[¶ . . . ¶]

---

[3] The criminal protective order appears to have been terminated on February 7, 2020.

"Court: And somebody wrote in [the plea paperwork] that you admitted to willfully and lawfully inflicting corporal punishment resulting in a traumatic condition to my spouse, and you initialed that.

"Paul: Yes.

"Court: And at the end you swore under oath . . . that you'[d] read everything, understood everything, initialed everything, and everything [was] true and correct.

"Paul: But I did not read everything. And that was the problem.

"Court: So you didn't read it. You signed it, but you didn't read it.

"Paul: Correct.

"[¶ . . . ¶]

"Court: So you didn't read it when you initialed it either?

"Paul: Correct.

"[¶ . . . ¶]

"Paul: This is the first time I was ever arrested for anything. So legal matters were not anything that I had any knowledge of. I was listening to my attorney the whole time.

"Court: Did your attorney tell you to lie to the court?

"Paul: Yeah."

### 2.    The Alleged Child Abuse Incident

The second incident was the alleged child abuse incident. According to Paola's DV-100 and her subsequent declaration, the child had shared with Paola a comment (or possibly comments) that Paul had made to the child and that Paola interpreted as a sign of abuse. Paola was "horrified" by the comment(s) and reported the matter to Child Protective Services.

When asked if he had made the comment(s), Paul testified "absolutely not;" and, when asked about a video Paola had recorded of the child

5

discussing the matter, Paul testified it was "very difficult to watch."  He theorized the child might have misconstrued remarks he had made regarding how best to attend to matters of personal hygiene.  In addition, he testified that the Child Protective Services investigation had been closed and that he had been informed that the results of the investigation were inconclusive.[4]

### 3.    The Courthouse Incident

The alleged child abuse incident led to Paola initiating an effort to obtain a restraining order for the ostensible purpose of protecting the child from Paul; and this in turn led to the courthouse incident—which unfolded in two different interactions, on two different floors of a courthouse, as follows.

### a.    Interaction on Fourth Floor of Courthouse

In the first interaction, Paola (with the child in tow) and Paul met unexpectedly on the fourth floor of the courthouse in the vicinity of the family law business office after Paola, unbeknownst to Paul, had earlier that day obtained a temporary restraining order to protect the child from Paul.[5]  Paul characterized his behavior during the interaction as innocuous and non-threatening, and Stacer corroborated as much.  In Stacer's words:

> "A lady [Paola] was . . . seated at a bench to my right and appeared to be working on paperwork.  She was with a young [child].  [¶]  While I was waiting [to be called into the

---

[4]    This testimony is consistent with a letter from Child Welfare Services to Paul, dated less than two months after the investigation had been initiated, stating:  "After conducting an investigation, we have concluded that this referral may be closed effective [immediately]."  (The record does not reveal whether this letter was used at the hearing.)

[5]    Paola and Paul had made an appointment for Paola to bring the child to Paul for visitation that morning, but Paola had not kept the appointment (because she had instead gone with the child to the courthouse to make the request for a restraining order).

6

clerk's office], a man that has been subsequently identified as Paul Frutiger came down the hallway from the direction of the fourth floor escalator. When he came abreast of the entrance to the clerk's office, he and the little girl noticed each other. [¶] Mr. Frutiger said something like 'Hi' in a happy voice and the little girl responded with an excited 'Daddy!' [¶] There may have been other words exchanged, but they were non-threatening, in level tones and the lady immediately guided the little girl down the hallway. Mr. Frutiger did not chase or follow them."

Paola, in her DV-100 described the same encounter differently, as follows:

"I had a TRO court hearing for my [child]. I stayed in the courthouse after the hearing with my attorney because we had to file more paperwork. While waiting for my turn to be called to file, Paul Frutiger showed [up] in the business office and started yelling at my [child] (violating the restraining order[6]) and he started calling me names. I covered my child's ears and ran away from him."

### b.    Interaction on First Floor of Courthouse

The second courthouse interaction occurred in the lobby on the first floor. According to Paola:

"[After] I . . . told my attorney that Paul was in the courthouse and what just happened, . . . we went downstairs [to the first floor lobby] and talked to the deputy about him. [My attorney] was giving . . . the details of the incident to the deputy, when I saw Paul coming towards . . . me with a very angry face. I yelled to my attorney 'He's here.' Paul came toward me yelling at me. He looked furious and looked like he was going to attack me. The deputy had to stop[] him from getting close to me and our child. He fought with the deputy. [The deputy] had to call another person to help . . . restrain him."

---

[6]    This encounter would not have been a violation of the TRO, as Paul had not yet been served with the TRO.

By Paul's account:

> "The event that happened in the downstairs was not aggressive and was not a threat to Paola.  I simply pointed my finger at her and said with a normal tone 'what you are doing is sick'.  Paola and her attorney stood up quick and yelled 'Here he is!  Here he is!' which was [more] likely to scare people . . . than [my] pointing a finger.  [¶]  I never fought them, yelled at them, or resisted them."

The deputies described the interaction on the first floor of the courthouse in terms somewhat different from the descriptions furnished by Paul and Paola.  One of the deputies—Deputy Green—testified that Paola's attorney had flagged him down and presented him with "an unserved restraining order that [had] just [been] granted that day."

> "A.  I was talking to [Paola and her attorney] about the whole altercation [that had occurred upstairs].  I recall, out of nowhere, your client started saying, 'There he is.  There he is.'  [¶]  By the time I turned around, the respondent was already coming fast, at a fast pace towards the petitioner, saying – stating things, pointing fingers, kind of – his emotions were high. [¶]  I don't think he was going to attack her, . . . he wasn't being violent but more so aggressive towards her.

> "Q.  And the child was still sitting next to her.  Correct?

> "[¶ . . . ¶]

> "A.  The child was present.

> "Q.  Okay.  And then what did you do?  . . .

> "A.  So he already disregarded I was even standing there. He passed me right away, pointed his finger, shouting at her, 'You're a sick woman. You're sick.'  [¶]  I said, 'Sir, step back.'  I probably asked him two to three times, 'Step back.' He . . . ignored my commands at first.  That's when I told him, 'Turn around.  Put your hands behind your back.'  [¶] He . . . started saying, 'Why?  Why?'  Kind of put his hands up.  That's when I took control of him and turned him

8

around and placed him in the handcuffs and sat him down and detained him.

"[¶ . . . ¶]

Q. [H]is behavior was very aggressive. Correct?

"A. I wouldn't say very aggressive, but I would say it was to the point where I articulated the need, due to his lack of following my commands, as well as of his behavior towards the petitioner, that I needed to place him in the handcuffs."

Both deputies testified that only one of them had been involved in restraining Paul, but that the other—Deputy Dayani—had briefly became involved afterwards. According to Deputy Dayani:

"A. I looked back because I heard some yelling and arguing, and at that point, it appeared that Mr. Frutiger was in handcuffs. I approached Mr. Frutiger and Deputy Green and I heard them going back and forth and arguing. And I just remember hearing Mr. Frutiger saying that there was no restraining order, and I heard Deputy Green say: Are you calling me a liar? And it just kept going back and forth.

"Q. Okay. Was this all in a soft tone?

"A. It was in [an] elevated tone.

"[¶ . . . ¶]

"Q. Did you mention anything to anybody about obeying commands?

"A. Yeah.

"[¶ . . . ¶]

"A. While Deputy Green was securing Mr. Frutiger, I tried to calm Mr. Frutiger down. I told him that you can comply now and complain later after you figure everything out, but for now, you need to listen to Deputy Green's instructions. That seemed to kind of ease him, calm him down.

"Q. When you saw him when you were asking him to comply now, what was his demeanor?

9

"A. Upset. Very angry. Yeah. At first he was very angry, and then – then I just mentioned comply now, complain later, and he kind of settled down."

### 4. The Alleged Abduction Incident

The last of the four incidents mentioned above was the alleged abduction incident. A professional supervised visitation monitor whose agency had been engaged to monitor visits between Paul and the child testified that, during a visitation on December 24, 2022, Paul had insisted on bringing the child into his home to open Christmas presents in defiance of the monitor's insistence that he comply with protocols prohibiting visitation at a monitored party's home absent a request, home inspection, and approval in advance. The monitor testified that "there was no physical violence at any time" and that Paul did not mistreat the child at any time during the visitation, but that Paul had told him "he didn't like my attitude," said "he wasn't going to be pushed around," and "refused to comply."[7]

---

[7] The monitor also testified on the topic of whether he had felt that he or the child had been in danger, but he contradicted himself on this topic. On direct examination, he testified as follows:

> "A. Did you feel at any time that you were in danger?
>
> "A. I would say yes. When we were at the house . . . I didn't know what to expect. We're in a place that I've never been at. We're not supposed to be there. I didn't know what to expect. That's why I never left the door.
>
> "Q. Did you feel the child was in danger?
>
> "A. Yes, because if for any reason . . . I wouldn't have been there, I don't know what would have happened.
>
> "Q. Okay. And nothing that you said could overcome dad's refusal to obey any of your instructions?
>
> "A. He would not comply . . . with my instructions, no, ma'am."

But, on cross-examination, he said: "I didn't say that I felt I was in danger. I just said that I wasn't in control of the situation."

The monitor's supervisor testified that Paul's recalcitrance had required her to come to Paul's home to extricate the child from the visit. Furnishing context for the monitor's testimony she explained that supervised visits in a supervisee's home are rare occurrences due to safety concerns that require extensive advance vetting:

> "As far as home visits, that is the last thing that we would allow, and that's after an extensive amount of time with the family and with an extensive amount of – you know, the home inspection. We also . . . evaluate the behavior of the parents. It takes months and months and months, and most of our clients . . . out of all of our clients, we have [only] one family that . . . is approved to have home visits."

Referring to Paul having brought the child into his home in defiance of the instructions of the monitor and to the monitor's responsibility to be present with the child, she characterized the situation as an "abduction" and said that "hav[ing] someone . . . abduct[] a child and the monitor . . . has never happened to us before."

The supervisor further testified that, when she arrived, Paul's "first response was . . . that the monitor didn't look legit" and that he "[was] not going to listen to the monitor because he didn't look legit." She also testified that she had "worried about [her] safety" while traveling to Paul's home to extricate the child, but that "[b]y the time I arrived, things seemed to be calm" and Paul "was compliant with giving us . . . [the child and] providing us with a car seat."

Speaking in general terms, and then zeroing in on an encounter that had occurred two days later (when Paul came to the agency to retrieve the child's car seat), the supervisor testified:

> "At times Mr. Frutiger has been wonderful to work with, and at times, his temper flared up.
>
> "[¶ . . . ¶]

11

"[At] times he was compliant, soft spoken. However, during my interaction with him on the 26th, I could see him getting agitated. I noticed that the veins in his neck were starting to show. It seems that things were escalating, and I did not feel safe because I did not know if things were going to escalate more or if things were going to calm down."

Although the supervisor insisted that rules, regulations, and orientation materials that her agency routinely supplied to supervisees furnished notice that approval in advance would be required before a visitation in a supervisee's home could be permitted, Paul elicited testimony on cross-examination that prompted the trial judge to state: "I'll agree with you it doesn't specifically state: No home visits without approval. It doesn't say those words."

### 5. Additional Evidence

During the hearing, Paul was questioned about messages he had sent to Paola. Some of these messages included threatening language that Paul said was being taken out of context and had not been intended literally—for example, "I will fucking kill you" and "If you think this is just a game I'm gonna make this really hard on you and I'm going to destroy you!!!" Other such messages expressed contempt—for example "I despise you" and "You're not qualified to be a mother[,] you're only qualified to be a teacher."

In addition, the DV-100 and DV-120 included statements by the parties that were of a general nature. An example of such a statement from Paola in the DV-100 is:

"[Paul] started recently to yell and curse at me in front of our [child] and now he is threatening me again every time he doesn't get[ ] what he wants. He uses emotional and physical manipulation such as retaliation, intimidation and harassment. He knows I am scared of him and tries to control all situations."

12

Examples of generalized statements from Paul in the DV-120 include: "Paola has a tendency to overreact to situations," "[s]he is abusing the police and court system as a weapon against me[,] causing me mental a[n]guish, stress, and financial burdens that can't be recouped," and "I fear my job is [in] jeopardy with all the time taking off work . . . for these hearings."

## B. *The DVRO*

At the conclusion of the evidence presented during the hearing, and after a closing argument by Paul, the trial court ruled from the bench and the deputy clerk recorded the judge's ruling in a minute order as follows:

> "The Court does not find a pattern of mischaracterization as presented by the two deputies during their testimony. The Court saw the evidence and listened to the argument of [Paul]. [Paul] was noticed, by the supervision monitors, that he was not authorized to take the minor child to his home and he continued to do so. The Court does not find [Paul] very credible. [By] a preponderance of the evidence, the Court finds that [Paola] has met her burden of proof for a restraining order on her own behalf. The request for a restraining order [for] the minor child is denied[,][8] but she is included as a protected party on [Paola's] Domestic Violence Restraining Order. The Court grants the request for a period of 5 years. Child custody/visitation orders are made under [Family Code] §3044. The Court makes [Family Code] §3048 findings and modifies Mr. Frutiger's visitations: Supervised visitations are terminated. Mr. Frutiger's visitations will take place solely during conjoint therapy with the minor child."

Paul timely appealed.

---

[8] The two restraining order proceedings—the one that is the subject of this appeal and the one that Paola had initiated on the day of the courthouse incident—had been combined into one single evidentiary hearing.

## II.
## DISCUSSION

**A.** ***The Domestic Violence Prevention Act***

The Domestic Violence Prevention Act (the Act), codified at Family Code § 6200 et seq.,[9] exists for the "purpose of . . . prevent[ing] acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence."  (§ 6220.) Included within the Act's definition of domestic violence is "abuse perpetrated against . . . [a] spouse or former spouse" or "against . . . a child of a party" (§ 6211, subds. (a), (d)); and included within the Act's definition of "abuse" are "intentionally or recklessly caus[ing] or attempt[ing] to cause bodily injury," "plac[ing] a person in reasonable apprehension of imminent serious bodily injury to that person or to another" (§ 6203, subd. (a)(1), (3) & (4)), and "attacking, striking, stalking, threatening, . . . [or] harassing . . . the other party," or "disturbing the peace of the other party" by "destroy[ing] the[ir] mental or emotional calm."  (§ 6320, subds. (a), (c).)

Pursuant to the Act, a court may issue a restraining order "if an affidavit or testimony . . . shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse."  (§ 6300.)  The required burden of proof is a preponderance of the evidence.  (*BR.C. v. BE.C.* (2024) 101 Cal.App.5th 259, 269 (*BR.C.*).)  "The court may issue [a restraining] order . . . based solely on the affidavit or testimony of the person requesting the restraining order." (§ 6300, subd. (a); see also *In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106, 118–119.)

---

9     All further statutory references are to the Family Code.

**B.** *The Standard of Review*

" 'We review an order granting or denying a DVRO for abuse of discretion.' " (*BR.C., supra,* 101 Cal.App.5th at p. 269; accord *In re Marriage of D.S. & A.S.* (2023) 87 Cal.App.5th 926, 933 (*Marriage of D.S. & A.S.*).) "A court abuses its discretion only when" the decision it makes is " ' " 'an arbitrary, capricious, or patently absurd determination.' " ' " (*In re Caden C.* (2021) 11 Cal.5th 614, 641 (*Caden C.*); see also *Marriage of D.S. & A.S.*, at p. 933 [" ' "[t]he appropriate test . . . is whether the trial court exceeded the bounds of reason" ' "].)  As a consequence, " ' " [w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court' " ' " (*Caden C.,* at p. 641) and "should interfere only ' "if . . . under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he [or she] did." ' " (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067 (*Robert L.*).)

**C.** *Paul's Contentions on Appeal*

As noted *ante*, Paul contends that the DVRO should be reversed because (1) it is not supported by substantial evidence, (2) the evidentiary hearing was procedurally deficient, and (3) the DVRO's duration is excessive. We examine each of these contentions in turn.

**1.      Sufficiency of Evidence in Support of the DVRO**

Paul's first contention is essentially an argument that the court was presented with evidence on the basis of which it would have been justified in rejecting Paola's evidence, favoring Paul's evidence, and finding against Paola and in favor of Paul.  Thus, for example, Paul argues that Paola said in prior sworn testimony that the alleged strangling incident had been "just a misunderstanding;" that the deputies testified he had "not [been] acting in a violent manner" during the courthouse incident; and, that the trial court had

15

agreed that the visitation monitoring agency's rules did not explicitly state that advance approval was required before visitation could occur in a supervisee's home.

There are two problems with this argument.

First, the argument misconstrues the nature of the inquiry in which an appellate court must engage when it reviews a record to determine whether an order is supported by substantial evidence. A substantial evidence standard of review is a "deferential standard of review" in which "findings of fact are liberally construed to support the judgment" and in which "we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings" (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981), "*accept*[*ing*] *as true all evidence tending to establish the correctness of the trial court's findings and resolv*[*ing*] *every conflict in favor of the judgment.*" (*BR.C., supra,* 101 Cal.App.5th at p. 269; italics added.) Under this standard, even "[a] single witness's testimony may constitute substantial evidence to support a finding." (*Thompson*, at p. 981.) The inquiry is, " 'not whether a contrary finding might have been made,' " but " 'whether substantial evidence supports the court's finding.' " (*BR.C., supra,* at p. 269.)

Here, the trial court heard substantial evidence of behavior on the part of Paul, directed at Paola, that was abusive within the meaning of the Act. (See *ante*.) "To the extent [Paul] argues the trial court should have believed *his* version of events over [Paola]'s version, we cannot make such a finding. On appeal, we resolve all factual conflicts and questions of credibility in favor of the prevailing party [citation] [and] cannot substitute our own credibility determinations and factual findings for that of the trial court." (*BR.C., supra,* 101 Cal.App.5th at p. 269; italics added.)

16

The second problem with Paul's argument is that the record on which it rests is missing Paola's hearing testimony, and this omission renders the record fatally incomplete. " 'When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.' " (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.)  It is not possible for a reviewing court to make such a determination when the testimony of a key witness has been omitted from the record. "Where no reporter's transcript has been provided and no error is apparent on the face of the existing appellate record, the judgment must be *conclusively presumed correct* as to *all evidentiary matters,*" such that  "an appellant who attacks a judgment but supplies no reporter's transcript will be precluded from raising an argument as to the sufficiency of the evidence." (*Estate of Fain* (1999) 75 Cal.App.4th 973, 992.)

The trial court here found not only that Paul was "not . . . very credible," but, by implication, that Paola to at least some extent *was* credible and that Paul had engaged in acts of abuse against her.  To show that the court erred in this assessment, Paul would have had to furnish a record that included all of the testimony relevant to this finding—including the testimony of his accuser, Paola.  But he did not do so.  This failure, in and of itself, defeats Paul's argument that the DVRO is not supported by substantial evidence.  (See, e.g., *Foust v. San Jose Construction Co., Inc.* (2011) 198 Cal.App.4th 181, 186-187 [observing that appellant's "[f]ailure to provide an adequate record on an issue" is "fatal" inasmuch as it "requires that the issue be resolved against [him]," and cataloging "numerous situations" in which "appellate courts have refused to reach the merits of an appellant's claims

17

because no reporter's transcript of a pertinent proceeding or a suitable substitute was provided"]; see also *Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609; *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 132; *Parker v. Harbert* (2012) 212 Cal.App.4th 1172, 1178.

It is true that the testimony supplied by five of the six witnesses who testified at the evidentiary hearing was preserved and included in the record for appeal. However, it cannot reasonably be disputed that the testimony of Paola at the hearing is essential to an understanding of the sufficiency of the evidence considered by the trial court.

The problem posed by the absence of a transcript of Paola's testimony is illustrated by Paul's emphasis, in his appellate brief, on two documents that a minute order indicates he either used or attempted to use during his cross-examination of Paola.[10] In one of these documents—a 2018 ex parte request and order to terminate domestic violence temporary restraining order, Paula ostensibly stated: "I don't believe he is a threat to me or our baby . . . ," "we will seek . . . help to find a solution to our problems," and "we both want to go to marriage counseling." In the other (identically titled) document from 2000, Paola ostensibly stated: "I don't believe we need to restrain[] any party due to this occasion was just a misunderstanding" and "[there] is no threat or fear for anybod[y's] life."

Paul cites these statements in support of an argument that Paola's allegations should have been "stricken from the evidence" due to her "history

---

[10] The minute order indicates that a sensitive video was played during Paola's direct examination by her counsel and that the two documents referenced above, along with a "strangulation report," were "identified" during her cross-examination by Paul. But nothing in the record sheds any light as to the substance of Paola's testimony regarding any of these items or regarding any other matters in dispute.

of making domestic violence allegations and obtaining restraining orders against [him] only to later recant."[11]  The statements certainly are relevant and probative (cf. *People v. Brown* (2004) 33 Cal.4th 892, 895-907 [discussing at great length the admissibility of evidence pertaining to "the tendency of domestic violence victims to recant"]), even if not necessarily dispositive. (Cf. *Boermeester v. Carry* (2024) 100 Cal.App.5th 383, 397 [observing that "there is nothing questionable about choosing to find a victim's initial statement more credible than a later recantation of that statement, particularly in domestic violence cases" or "about finding a victim more credible than the alleged attacker."].)  But, because we have neither a transcript nor a settled statement to reveal what Paola may have said when confronted with them, we are left completely in the dark as to what Paola might have said about these documents and, therefore, as to how the plaintiff's testimony on a key issue in the case might have influenced the finder of fact."

## 2.  Alleged Procedural Deficiencies

Paul's second contention is that the hearing was procedurally deficient because it "did not provide him with a meaningful opportunity to be heard." Specifically, he contends the trial court abused its discretion:  (i) in not "allow[ing] [him] to state his position on the issuance of the DVRO and refute the allegations in the [DV-100] in contravention of Section 6300;" (ii) in "mak[ing] no inquiry as to the basis for [the] objections" he had expressed in

---

11    As further support for this argument Paul cites a declaration, ostensibly signed by Paola in 2018, in which the alleged strangling incident is described in a manner that largely exculpates Paul.  However:  we find no indication in the record that this document was filed in or otherwise presented to the trial court; we have previously denied without prejudice Paul's request to augment the record to include this document; and Paul has not availed himself of the opportunity afforded to him to renew his request to augment in a manner showing that this document was in fact filed or lodged.

19

his DV-120; (iii) in permitting certain witnesses to testify over his objection "in violation of Cal. R. 5.113(e)"; (iv) in denying requests for a continuance to enable him to prepare for the questioning of such witnesses pursuant to California Rules of Court, rule 5.113(f)); (v) in denying, "without a finding of good cause," a request to be permitted to call impeachment witnesses "in contravention of Cal. R. 5.113(c)"; and, more generally, (vi) "in failing to conduct hearings in this case as required by Family Code section 6340, California Rules of Court, Rule 5.113 and principals of due process."

Addressing these arguments in sequence, we begin by noting, as to argument number (i), that the record reveals Paul was afforded ample opportunity to state his position and to present evidence and arguments in opposition to Paola's position and, moreover, that he availed himself of this opportunity—in his DV-120, in three days of witness testimony, and in a closing argument.

Turning to argument number (ii), the burden is not on a trial court to "mak[e] inquiry as to the basis" for a party's arguments;[12] rather it is on the party to make those arguments—convincingly, and with evidentiary support.

With respect to argument numbers (iii), (iv), and (v), Paul identifies neither the witnesses to whom he is referring nor where in the record support for his assertions is to be found. This circumstance alone is a sufficient ground on which to deem these arguments forfeited.

> "An appellant must direct us to the parts of the record that show the claimed error. 'An appellate court is not required to search the record to determine whether or not the record

[12] Paul uses the term "objections" in this argument; however, he did not submit evidentiary objections with his DV-120, and the context suggests his use of the term "objections" is a reference to arguments, rather than to formal objections.

supports appellant['s] claim of error.  It is the duty of [appellant] to refer the reviewing court to the portions of the record which support appellant['s] position.' "  "Under the California Rules of Court, each brief must '[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears.'  (Cal. Rules of Court, rule 8.204(a)(1)(C).)  'If no citation "is furnished on a particular point, the court may treat it as [forfeited]." ' "

(*Citizens for Positive Growth & Pres. v. City of Sacramento* (2019) 43 Cal.App.5th 609, 626 fn. 8 (*Citizens*); accord *City of Chula Vista v. Stephenshaw* (2023) 91 Cal.App.5th 352, 367 (*City of Chula Vista*).

Turning to number (6), Paul's final procedural argument:  Apart from its reference to section 6340, this argument merely duplicates arguments addressed *ante*.  As for the section 6340 reference,[13] Paul does not specify in what manner he believes the hearing in this case failed to comply with this section.  Consequently, the argument is forfeited.  (See *Citizens, supra,* 43 Cal.App.5th at p. 626 fn. 8; *City of Chula Vista, supra,* 91 Cal.App.5th at p. 367.)

### 3.    Duration of the DVRO

Paul's final contention is that that the five-year duration of the DVRO is excessive.  Paul acknowledges, as a general statement of the law, that the

---

[13]    Section 6340, subdivision (a)(1) provides in pertinent part:  "The court may issue any of the orders described in Article 1 (commencing with Section 6320) after notice and a hearing.  When determining whether to make any orders under this subdivision, the court shall consider whether failure to make any of these orders may jeopardize the safety of the petitioner and the children for whom the custody or visitation orders are sought. If the court makes any order for custody, visitation, or support, that order shall survive the termination of any protective order.  The Judicial Council shall provide notice of this provision on any Judicial Council forms related to this subdivision."

Act empowers courts to enter domestic violence restraining orders that long in duration. (See Fam. Code, § 6345, subd. (a); *Malinowski v. Martin* (2023) 93 Cal.App.5th 681, 694 (*Malinowski*).) But he contends five years for this case is excessive. In support of this contention, he argues that:

> "Given [Paola]'s history of making domestic violence allegations and obtaining restraining orders against [Paul] only to later recant such allegations as documented herein, the five-year period of the DVRO issued by the trial court is excessive and will only serve to hinder any attempt by [Paul] at maintaining a relationship with his minor child."

However, for each of three reasons, we do not agree with this argument.

First, adverting to our discussion of the standard of review for an abuse of discretion, we cannot say that, " ' "under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that [the trial court in this case] did." ' " (*Robert L., supra,* 21 Cal.App.4th at p. 1067.) Consequently, we are not at liberty to "interfere." (*Ibid.*)

Second, in the same way that the record on appeal prevents our assessment of whether the DVRO is supported by substantial evidence (i.e., the absence of a transcript of Paola's testimony at the hearing), it likewise interferes with our ability to assess whether the duration of the DVRO might be excessive.

Third, the five-year term is not unalterable. The Act renders domestic violence restraining orders "subject to termination or modification on the motion of a party"[14] (*Malinowski, supra,* 93 Cal.App.5th at p. 694; § 6345), and it may help to *promote* his relationship with the child. As noted *ante*, the trial court's ruling from the bench contemplated that Paul and his child

---

[14] Notably, a DVRO also may be renewed *beyond* its initial term. (See § 6345.)

would engage in conjoint therapy.  We do not discount the prospect that such therapy will be successful, or that it may result in a basis for an early termination or modification of the DVRO.  Nor do we presume that it will not help lower the temperature of the relationship between Paul and Paola as co-parents or otherwise promote the relationship between Paul and his child by achieving the Act's purpose of interposing "a separation of the persons involved in the domestic violence for a period sufficient to enable them to seek"—and hopefully achieve—"a resolution of the causes of the violence." (§ 6220.)

## III.
## DISPOSITION

The restraining order is affirmed.


                                                                KELETY, J.

WE CONCUR:


DATO, Acting P. J.


RUBIN, J.